IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 4, 2014 Session

**IN RE KALIYAH S. ET AL.**

**Appeal by Permission from the Court of Appeals, Eastern Section
Juvenile Court for Bradley County
No. J-08-435     Daniel Ray Swafford, Judge**

---

**No. E2013-01352-SC-R11-PT - Filed January 22, 2015**

---

        In this petition to terminate the parental rights of a biological parent, we granted permission to appeal to address whether the State is required to prove that it made reasonable efforts to reunify the parent with the child as a precondition to termination. We hold that it is not. An action to terminate the parental rights of a biological parent is governed by Tennessee Code Annotated § 36-1-113. The language of Section 36-1-113 makes the State's efforts to assist the respondent parent one of the factors to be considered in determining whether termination of the parent's rights is in the child's best interest. After reviewing the language of Section 36-1-113, other pertinent statutes, the legislative history, and caselaw interpreting Section 36-1-113, we hold that, in a termination proceeding, the extent of the efforts made by the State is weighed in the court's best-interest analysis, but the State need not prove that it made reasonable efforts as an essential component of its petition to terminate parental rights. In so doing, we overrule ***In re C.M.M.***, No. M2003-01122-COA-R3-PT, 2004 WL 438326 (Tenn. Ct. App. Mar. 9, 2004), and its progeny to the extent that those cases required the State to prove reasonable efforts as an essential component of the termination petition. Accordingly, we reverse the decision of the Court of Appeals and reinstate the judgment of the juvenile court terminating the parental rights of the respondent father.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed; Judgment of the Trial Court Reinstated**

HOLLY KIRBY, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and JEFFREY S. BIVINS, JJ., joined.

Robert E. Cooper, Jr., Attorney General & Reporter; Joseph E. Whalen, Acting Solicitor General; Alexander S. Rieger, Assistant Attorney General; and Kathryn A. Baker, Assistant Attorney General, for the appellant, Tennessee Department of Children's Services

Wilton Marble, Cleveland, Tennessee, for the appellee, Rontez L.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Kayla S. ("Mother") is the biological mother of two children, the child at issue in this appeal, Kaliyah S., born in July 2008, and Kaliyah's younger sister Jaya P., born in January 2010. Respondent/Appellee Rontez L. ("Father") is Kaliyah's biological father. Josh P. ("Josh") is the biological father of the younger child, Jaya. This appeal reviews only the termination of Father's parental rights as to the older child, Kaliyah.

### Factual Background

By the time Kaliyah was born, Mother and Father were no longer together, and Mother had begun a relationship with Josh. Mother, Josh, and Father all knew that Father, and not Josh, is Kaliyah's biological father. Despite this knowledge, Mother listed Josh as Kaliyah's father on the child's birth certificate. After Kaliyah's birth, Mother, Josh, and Kaliyah lived together as a family in Bradley County, Tennessee.

In October 2008, when Kaliyah was about three months old, the Petitioner/Appellant State of Tennessee, Department of Children's Services ("DCS" or "the State") responded to a call from the home of Mother and Josh and found suspicious bruises on Kaliyah. DCS filed a dependency and neglect petition in the Juvenile Court for Bradley County ("Juvenile Court") against both Mother and Josh. The Juvenile Court entered an order finding Kaliyah dependent and neglected and removed the child from the home. The order included a no-contact provision that prohibited Josh from having any contact with Kaliyah. Kaliyah was placed in a foster home.

The permanency plan DCS subsequently developed for Mother and Josh referenced its ongoing child abuse investigation and the no-contact order against Josh. Despite this, Mother continued her relationship with Josh. The younger child, Jaya, was conceived while Kaliyah was in DCS custody.

On June 25, 2009, DCS returned Kaliyah to Mother's custody. At the time, it appeared to DCS that it was safe to return the child to Mother's care because Josh was no

longer living with Mother and the no-contact order against Josh remained in effect. Not long after that, Josh moved back in with Mother and Kaliyah.

Jaya was born in January 2010. By October 2010, Mother, Josh, Kaliyah, and Jaya had moved into an extended-stay motel room in Cleveland, Tennessee. Mother attended school and worked one or two jobs. While Mother was away, Josh was the caregiver for two-year-old Kaliyah and infant Jaya.

Meanwhile, Father spent a significant amount of time in jail. From February 2009 to August 2009, Father was incarcerated on several drug offenses. In December 2009, Father was convicted on a domestic assault charge. Shortly after that, he was convicted on a vandalism charge and returned to jail in February 2010 for violating parole. He was again released on probation in July 2010. A short time later, he was re-arrested for domestic assault. He pleaded guilty and received a 364-day sentence. Father was released on November 29, 2011, just a week before commencement of the trial in this case.

When Father was not in jail, Mother occasionally brought Kaliyah to visit Father at his home.[1] At times when Kaliyah was in foster care and Father was not in jail, he visited her occasionally in her foster home. At no point, however, did Father seek or have custody of Kaliyah. He never had any regular structured parenting time with the child, and he never paid any child support for her.

In May 2010, during one of Father's prison stays, the State of Tennessee filed a petition on Mother's behalf to establish Father's paternity as to Kaliyah. In response, Father waived his right to a DNA test and admitted that he is Kaliyah's biological father.[2] On May 6, 2010, the Juvenile Court entered an order establishing Father as Kaliyah's biological father and ordering him to make child support payments. Father made no support payments according to that order or otherwise.

On the morning of November 22, 2010, eleven-month-old Jaya began having seizures. Emergency medical personnel were called and Jaya was air-lifted to a local hospital. Once there, the child was found to have suffered a horrifying array of injuries, including intracranial hemorrhaging, retinal bleeding in both eyes, and fractures in both legs. Some of the injuries were old, and others had occurred within seventy-two hours before

---

[1] In his later testimony in the termination proceedings, Father asserted that Mother first brought Kaliyah to visit him when the child was four months old. The record indicates, however, that by the time Kaliyah was four months old, DCS had taken the child into protective custody and she was in foster care.

[2] At some point, Josh took a paternity test and was excluded as Kaliyah's biological father.

the child was admitted to the hospital. DCS received a report diagnosing infant Jaya with possible shaken baby syndrome.[3] DCS concluded that Jaya's injuries resulted from abuse by either Mother, Josh, or both.

In the wake of the diagnosis of Jaya's injuries, DCS took both Kaliyah and Jaya into emergency protective custody. Both were placed in foster care.

### Termination Proceedings

On November 30, 2010, about a week after the children were taken into DCS protective custody, DCS filed a combined petition in the Juvenile Court, asserting that Kaliyah and Jaya were dependent and neglected and seeking termination of the parental rights of both Mother and Josh. The petition alleged that Mother and Josh had committed severe abuse against both children.[4] Severe abuse was the basis for DCS's request for a declaration of dependency and neglect as well as the statutory ground for termination of the parental rights of Mother and Josh.[5] *See* Tenn. Code Ann. § 36-1-113(g)(4) (2014) (listing severe abuse in dependency and neglect proceedings as ground for termination of parental rights); *id.* § 37-1-102(b)(21) (2014) (defining severe abuse, which is a basis for a finding of dependency and neglect). The Juvenile Court gave DCS temporary protective custody of both children pending a hearing.

On December 2, 2010, after a preliminary hearing, the Juvenile Court found probable cause to conclude that both children were dependent and neglected by reason of severe abuse. Based on this finding, it excused DCS from making reasonable efforts to reunify the children with either Mother or Josh.[6] *See* Tenn. Code Ann. § 37-1-166(g)(4)(A) (2014).

---

[3] Shaken baby syndrome generally refers to medical findings of a serious brain injury caused by forcefully shaking a baby, usually out of frustration or anger. It is often accompanied by bleeding in the brain or eyes, and there may be no outward signs of injury.

[4] As relevant to this appeal, "severe child abuse" is defined as: "The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . ." Tenn. Code Ann. § 37-1-102(b)(21)(A)(i) (2014).

[5] A finding of severe abuse in dependency and neglect proceedings has serious ramifications not ordinarily at stake in cases of less severe conduct, since a finding of severe abuse can serve as a ground for termination of parental rights. *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011).

[6] As discussed in detail below, Tennessee statutes require DCS to make reasonable efforts to reunify a family after the child is removed from the home. Tenn. Code Ann. § 37-1-166(g)(2) (2014). Based on the aggravated-circumstances exception to this general rule, codified in subsection (g)(4)(A) of the statute, DCS

When DCS filed its Juvenile Court petition against Mother and Josh, it was laboring under the mistaken belief that Josh, listed as the father on Kaliyah's birth certificate, was Kaliyah's biological father. Eventually, DCS discovered that Father had been determined to be Kaliyah's biological father in separate paternity proceedings. A DCS caseworker then located Father, who was incarcerated at the time. In December 2010, DCS prepared a permanency plan for Father and brought it to him in jail. Father signed the plan and mailed it back to DCS.

On May 25, 2011, while Father was still incarcerated, DCS amended its Juvenile Court petition to include Father as a respondent and to seek termination of his parental rights as to Kaliyah. In the amended petition, the ground for termination of Father's parental rights was abandonment by engaging in conduct prior to incarceration that exhibited wanton disregard for the child's welfare.[7] Tenn. Code Ann. §§ 36-1-113(g)(1), -102(1)(A)(iv). In apparent reliance on the aggravated-circumstances exception in Section 37-1-166(g)(4)(A),[8] DCS averred: "Reasonable efforts [to reunify] are not required in the termination grounds against [Father]." DCS also asserted in the amended petition that Kaliyah's best interest would be served by terminating Father's parental rights.

Beginning on December 5, 2011, the Juvenile Court conducted a trial in this matter on six, non-consecutive days over the course of some fifteen months, concluding on March 11, 2013. Much of the testimony at trial centered on the abuse of the children by Mother and Josh. The evidence related to Father was undisputed in all relevant respects. It included Father's October 2012 testimony that he was again incarcerated, this time on additional charges of aggravated assault and aggravated domestic assault, and that he would not be eligible for release from prison until early 2013.

___

need not make such reasonable efforts if a court of competent jurisdiction determines that the parent has subjected the child, a sibling, a half-sibling, or any other child living in the home to "aggravated circumstances," including "severe child abuse, as defined in § 37-1-102." Tenn. Code Ann. § 37-1-166(g)(4)(A) (incorporating definition of "aggravated circumstances" found in Section 36-1-102(9) (2014)).

[7] "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).

[8] The statutory definition of the term "aggravated circumstances" includes abandonment, as well as other behaviors such as aggravated assault, aggravated child abuse and neglect, aggravated and especially aggravated sexual exploitation, rape, incest, and severe child abuse. Tenn. Code Ann. § 36-1-102(9).

On the last day of trial, at the end of the State's case-in-chief, Father's attorney made an oral motion to dismiss the termination petition against Father. As the basis for the motion, counsel for Father stated: "[N]othing in the file . . . indicates the State made any reasonable efforts with respect to [Father]. And I think what had happened was because [Father] had been lumped in with two potential abusers, and in severe abuse cases [DCS does not] have to make reasonable efforts." Counsel for Father noted that the termination petition did not even allege that DCS had made reasonable efforts as to Father, but instead maintained that reasonable efforts were not required. The Juvenile Court reserved its ruling on Father's motion.

On May 30, 2013, the Juvenile Court entered an order terminating the parental rights of Mother, Josh, and Father. Termination as to Mother and Josh was based on the ground of severe abuse. As to Father, the Juvenile Court held that DCS had proven the ground of abandonment by engaging in conduct prior to incarceration that exhibited wanton disregard for Kaliyah's welfare. Because it had proven that ground for termination, the Juvenile Court held that DCS was "therefore absolved of the requirement of making reasonable efforts" as to Father. The Juvenile Court also found that termination was in Kaliyah's best interest, so it granted DCS's petition to terminate Father's parental rights.

Father appealed the termination of his parental rights as to Kaliyah. Mother and Josh did not appeal.

**Intermediate Appellate Court Decision**

The Court of Appeals issued a divided decision reversing the Juvenile Court's termination of Father's parental rights. *In re Kaliyah S.*, No. E2013-01352-COA-R3-PT, 2014 WL 819419 (Tenn. Ct. App. Feb. 28, 2014). The majority disagreed with the trial court's holding that proving the ground of abandonment absolved DCS of its duty to make reasonable efforts as to Father. Interpreting the aggravated-circumstances exception in Section 37-1-166(g)(4)(A), the majority held that DCS is not relieved of its duty to make reasonable efforts until *after* a court of competent jurisdiction has made an adjudication that the alleged aggravating circumstances exist, and not before. *Id.* at *9 (citing *In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *9 (Tenn. Ct. App. Dec. 6, 2007)). Consequently, the majority concluded that, until the time at which the Juvenile Court made an actual finding of aggravated circumstances with respect to Father, DCS was required to make reasonable efforts to assist Father. Because such reasonable efforts were not made, the majority reversed the termination of Father's parental rights. *Id.* at *9-10.

In a dissenting opinion, Judge D. Michael Swiney expressed the view that, when aggravated circumstances are present, DCS is relieved of its duty to make reasonable efforts

to reunify from the time the child is removed from the home. ***Id.*** at \*11 (Swiney, J., dissenting). The dissent reasoned that, under the statutory definition of aggravated circumstances, abandonment is treated the same as the other more severe aggravated circumstances. ***Id.*** (citing Section 36-1-102(9)). Under the majority's holding, the dissent argued, DCS would be required to make reasonable efforts at reunification pending a hearing even where more egregious aggravated circumstances were involved, such as where the parent had perpetrated severe sexual abuse or rape against the child. Interpreting Section 37-1-166(g)(4)(A), Judge Swiney argued that this result was not intended by the Tennessee Legislature and concluded that he would affirm the trial court's termination of Father's parental rights. ***Id.***

Both the majority and dissent noted a split of authority within the Court of Appeals regarding the point at which DCS is relieved of its duty to make reasonable efforts when aggravated circumstances are involved. Based on this split, both viewed the instant case as appropriate for this Court's consideration. ***See id.*** at \*9 (majority opinion); ***id.*** at \*12 (Swiney, J., dissenting).

The State appealed the decision of the intermediate appellate court. We granted the State's application for permission to appeal.

### ISSUE ON APPEAL

The issue as framed by the Court of Appeals presupposes that, in this proceeding to terminate Father's parental rights, DCS must prove that it made reasonable efforts as to Father unless and until a court of competent jurisdiction finds aggravated circumstances. The majority and dissent disagreed only on the point at which DCS is relieved of its obligation to make reasonable efforts.

On appeal to this Court, the State raises an argument that disputes the premise of the issue as framed by the majority and the dissent on the intermediate appellate court. The State argues that Section 37-1-166(g)—which requires DCS to make reasonable efforts to reunify the family after a child is removed from the home based on dependency and neglect—is *generally* not applicable in proceedings to terminate parental rights. It notes that, under the statutory framework, dependency and neglect issues are addressed separately from termination issues. The State claims that proving Section 37-1-166 reasonable efforts is a precondition to termination of parental rights *only* to the extent that the reasonable-efforts requirement is specifically incorporated into the termination statute.

In response, Father notes that the argument made by the State to this Court was not made to either the trial court or to the intermediate appellate court. He contends that the

argument therefore has been waived, citing the longstanding principle that issues not raised at trial will not be considered for the first time on appeal. *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983). The State disagrees, claiming that it "has consistently argued at trial and on appeal that it had no obligation to make reasonable efforts." Assuming *arguendo* that the argument is new, the State contends that it should nevertheless be permitted to raise it because the Court of Appeals expanded the reasonable-efforts requirement to include all termination proceedings, a holding that "was unforeseen and unsolicited by the parties." This forced the State to address the issue on appeal to this Court.

Rules 13(b) and 36(a) of the Tennessee Rules of Appellate Procedure, considered together, give appellate courts considerable discretion to consider issues that have not been properly presented in order to achieve fairness and justice.[9] *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000) (citing *Aaron v. Aaron*, 909 S.W.2d 408, 412 (Tenn. 1995)). "Taken together, these rules permit appellate courts to grant complete relief to the parties as long as they have been given fair notice and an opportunity to be heard on the dispositive issues." *Id.* (citing *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 608 (Tenn. Ct. App. 1999)).

In this case, we exercise our discretion to address the larger issue of whether DCS is required to prove that it made reasonable efforts under Section 37-1-166 as a precondition to termination of parental rights.[10] First, the question impacts a biological parent's right to

---

[9] Rule 13(b) states:

Review generally will extend only to those issues presented for review. The appellate court shall also consider whether the trial and appellate court[s] have jurisdiction over the subject matter, whether or not presented for review, and may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process.

Tenn. R. App. P. 13(b).

Rule 36(a) states:

[Appellate courts] shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any relief . . .; provided, however, relief may not be granted in contravention of the province of the trier of fact.

Tenn. R. App. P. 36(a).

[10] We recognize the importance of the issue highlighted by the Court of Appeals in its divided decision, but we consider the argument made by the State on appeal to this Court to be of overriding importance.

the care and custody of his or her child, a right that is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65 (2000); ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993); ***In re Giorgianna H.***, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). Moreover, the issue raised by the State presents an important question of law and a matter of great public interest. As discussed more fully below, our review indicates that a number of Tennessee cases have applied the reasonable-efforts requirement to proceedings on termination of parental rights in a manner that is inconsistent with the statutory language and framework enacted by our Legislature. Therefore, we deem it prudent to consider the merits of the argument raised by the State on appeal to this Court.

## ANALYSIS

We first examine the relevant statutes and their legislative history, with an eye toward the development of the reasonable-efforts requirement and its relation to Section 36-1-113, the statute governing termination of parental rights. We then review Tennessee cases involving termination of parental rights, focusing on those that have factored DCS's reasonable efforts into the analysis. Finally, we interpret Section 36-1-113 to determine the circumstances under which DCS must prove that it made reasonable efforts to reunify child and parent as a precondition to terminating parental rights.

### Statutes

In Tennessee, proceedings to terminate parental rights are governed by statute. ***In re S.M.***, Jr., No. 01-A-01-9506-JV-00233, 1996 WL 140410, at *5 (Tenn. Ct. App. Mar. 29, 1996) ("Termination proceedings are civil in nature and statutory in origin."); ***see Osborn v. Marr***, 127 S.W.3d 737, 739 (Tenn. 2004). Determining the circumstances, if any, under which DCS must prove reasonable efforts in a proceeding to terminate parental rights necessitates an in-depth examination of the applicable Tennessee statutes. As will be seen below, it requires us to look at the evolution of Tennessee statutes on adoption, on dependency and neglect, and on termination of parental rights.

In the early 1970s, the statutes governing termination proceedings were scattered about in many sections of the Tennessee Code. Prior to 1977, the primary way to involuntarily terminate the parental rights of a biological parent was to prove that the child had been abandoned. ***See*** Tenn. Code Ann. § 36-110 (1977); *id.* § 37-203(a)(2) (1977). Adjudicating a child to have been "abandoned" amounted to a substitute for the biological parent's consent to adoption. There were no specific procedures for termination

of the parental rights of a biological parent. *See id.* § 36-102(5)(1), (2) (1977); *id.* § 37-246 (1977).

In 1977, Tennessee's General Assembly amended Section 37-246, the primary statute on termination of parental rights at that time. The amendment expanded the grounds for termination and set out procedures for termination proceedings. *See id.* § 37-246 (Supp. 1978) (as amended by 1977 Tenn. Pub. Acts ch. 482, § 6). Section 37-246 as amended permitted courts to terminate the parental rights of a biological parent if the petitioner established abandonment, severe child abuse, substantial noncompliance with a foster care plan (now a permanency plan), or the ground now known as "persistent conditions." *See id.* § 37-246(c), (d)(1)–(3) (Supp. 1978) (as amended by 1977 Tenn. Pub. Acts ch. 482, § 6).

The 1977 amendment also required the petitioner to prove that termination of the parental rights of the biological parent was in the best interest of the child. Tenn. Code Ann. § 37-246(d), (e) (Supp. 1978). The new best-interest provision included six factors for courts to consider in determining "whether there is a likelihood that the child can be returned to the parent in the near future" or "whether termination of parental rights is in the best interests of the child." Tenn. Code Ann. § 37-246(e) (Supp. 1978) (as amended by 1977 Tenn. Pub. Acts ch. 482, § 6). The second of the six factors was: "Whether the parent has effected a lasting adjustment *after reasonable efforts* by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 37-246(e)(2) (Supp. 1978) (emphasis added). In this context, the reasonable-efforts requirement first appeared in Tennessee statutory law.

At the time, the objective of Tennessee's adoption and juvenile statutes was to keep biological families intact. The same policy informed legislation at the national level. In 1980, the federal government enacted the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"). *See* Pub. L. No. 96-272, 94 Stat. 500 (1980) (codified as amended at 42 U.S.C. § 671 (2012)). The AACWA was enacted for the express purpose of furthering "family preservation . . . with a goal of reuniting children with their families after reasonable efforts by social services." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (citing *In re Lilley*, 719 A.2d 327, 332 (Pa. Super. Ct. 1998)). The Act sought to facilitate a nationwide child welfare system that would keep children with their biological parents and reduce foster care placements. David J. Herring, *Inclusion of the Reasonable Efforts Requirement in Termination of Parental Rights Statutes: Punishing the Child for the Failures of the State Child Welfare System*, 54 U. Pitt. L. Rev. 139, 152, 158 (1992) (hereinafter "*Herring*, 54 U. Pitt. L. Rev."). To do so, Congress offered federal funding for foster care to states that enacted legislation in conformity with the federal regulations. *See id.* at 150; 42 U.S.C. § 671. Under the plan, participating states had to require their state agencies to make reasonable efforts to keep children in their parents' home. If foster care nevertheless became

necessary, participating states were required to make reasonable efforts to reunify the family as soon as practicable. *See* 42 U.S.C. § 671(a)(15)(B) ("[R]easonable efforts shall be made to preserve and reunify families—(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to return to the child's home[.]"); *see also In re C.B.*, 611 N.W.2d at 493 (citing Debra Ratterman et al., *Reasonable Efforts to Prevent Foster Placement: A Guide to Implementation* 1 (2d ed. 1987)).

When the federal law was enacted in 1980, it did not define the term "reasonable efforts," so the participating states were left to define it for themselves. *Herring*, 54 U. Pitt. L. Rev. at 152, 154 (noting that, in defining "reasonable efforts," state legislators typically declined to "put any meat on the bare-boned federal reasonable efforts requirement" because a state agency's failure to make reasonable efforts could result in a loss of federal funds for foster care, without which "the state child welfare system would break down completely"). Courts all over the country began interpreting the federal reasonable-efforts requirement; this resulted in varying definitions of "reasonable efforts" and differences among states on the juncture at which the state agency had to make efforts to reunify families. *Id.*

In an effort to comply with the federal laws and thus secure federal funding for foster care, some states added a reasonable-efforts requirement to the statutory grounds for termination of parental rights. *Id.* at 156-57. States that did so, some scholars later observed, saw children suffer "by being denied a permanent home and by having instead to continue participating in a plan to reunify the biological family" even when "there [was] no hope that the parents [would] be able to provide a minimally adequate home." *Id.* at 157. ("The result in states that have added the reasonable efforts requirement to their [termination of parental rights] statutes has been to trap children in temporary foster care placements."). During this time period, Tennessee's Legislature did not enact a specific reasonable-efforts requirement.

In the early 1990s, Tennessee's Legislature finally codified a reasonable-efforts requirement in Section 37-1-166(g). The legislative history indicates that a primary goal of the new statute was to comply with the federal requirements in order to preserve federal funding for foster care.[11] Sponsoring legislators thought that federal funding would be imperiled if the Legislature failed to require juvenile courts in every case to make a specific finding on reasonable efforts to reunify the subject family:

---

[11] Some legislators had significant reservations about the proposed legislation. Senator Doug Henry referred to it as "a bad bill, it's a rachet bill." Debate on H.B. 1146/S.B. 1324 Before the Joint Legis. Sess., 87th Gen. Assemb. (Tenn. Mar. 9, 1992) (statement of Sen. Henry).

If we don't have a true reasonable-efforts test applied by the court on an individual case basis, we have a real risk, either we will lose federal funds or, in sometime in the future, the federal government will come in, after an audit, and say we will have to repay those dollars and it could be millions and millions of dollars involved.

*See* Debate on H.B. 1146/S.B. 1324 Before the Joint Legis. Sess., 87th Gen. Assemb. (Tenn. Mar. 9, 1992) (statement of Sen. Darnell).

The new Section 37-1-166 was entitled, "Orders committing or retaining a child within the custody of the department of human services – Required determinations." It defined the term "reasonable efforts" as "the exercise of reasonable care and diligence by the [Tennessee Department of Human Services] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g) (Supp. 1992)(as enacted by 1992 Pub. Acts ch. 587, § 2). It specifically required the State to make reasonable efforts to prevent removal of the child from the home and to reunify the family if removal became necessary. *Id*. Neither the language of this statute nor its legislative history contains any indication that the Legislature contemplated whether the State's reasonable efforts to reunify would be considered in the context of a proceeding to terminate parental rights.

In 1993, Tennessee formed a study commission on adoption. The commission sought to shift the State's focus away from the interests of the parents to focus on children's need for stability and permanency, and to bring uniformity to the laws governing the termination of parental rights.[12] *See* Debate on H.B. 406, Before the House, 90th Gen. Assemb. (Tenn. May 18, 1995) (statements by Rep. Fowlkes).

The work of the adoption commission resulted in a comprehensive revision of Tennessee's adoption statutes, enacted in 1995. The changes included an overhaul of the statutes on the rights of biological parents and the procedures for terminating parental rights. ***In re Audrey S.***, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005); *see* Diana L. Schmied, *A Roadmap Through Tennessee's New Adoption Statute*, 27 U. Mem. L. Rev. 885, 886-87 (1997) (hereinafter "***Schmied***, 27 U. Mem. L. Rev.").

The 1995 amendments removed the provisions on termination of parental rights from Title 37 on juveniles, foster care, and dependency and neglect proceedings and consolidated

---

[12] In the legislative debate on the legislation proposed by the commission, Representative Fowlkes described the prior statutes as an "antiquated" statutory scheme that treated children as the property of the biological parents, like "automobiles" or "cattle." *See* Debate on H.B. 406, Before the House, 90th Gen. Assemb. (Tenn. May 18, 1995) (statements by Rep. Fowlkes).

the termination provisions into a single separate statute in Title 36—Tennessee Code Annotated § 36-1-113. Unlike the previous termination provisions, the new statute, Section 36-1-113, specifically applied to both the State and to private parties who sought to terminate the parental rights of a biological parent, such as prospective adoptive parents.[13] Tenn. Code Ann. § 36-1-113 (1996) (as amended by 1995 Tenn. Pub. Acts ch. 532 (H.B. 406)); *Schmied*, 27 U. Mem. L. Rev. at 886-87.

The new termination statute included specific procedures for terminating the parental rights of biological parents who would not consent to termination. Tenn. Code Ann. § 36-1-113; *see In re Audrey S.*, 182 S.W.3d at 862. It clarified the now-familiar two-prong test for termination of parental rights—grounds and best interest. A petitioner seeking termination was required to prove that at least one of the six listed grounds for termination existed, and that termination of the biological parent's parental rights was in the child's best interest. Tenn. Code Ann. § 36-1-113(c). The new statute listed nine factors to be considered in determining the child's best interest. *See* Tenn. Code Ann. § 36-1-113(h); *Schmied*, 27 U. Mem. L. Rev. at 890 & n.35. The second best-interest factor remained unchanged—whether the parent had "failed to effect a lasting adjustment *after reasonable efforts* by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(h)(2) (emphasis added). Thus, under the new termination statute, the State's reasonable efforts to reunify the child with the biological parent continued to be only a factor considered in determining whether termination was in the child's best interest.

The 1995 overhaul of the adoption and termination procedures left intact the 1992 reasonable-efforts requirement set forth in Section 37-1-166. *See* 1995 Tenn. Pub. Acts ch. 532 (amending significant portions of Titles 36, 37, 68, and 71, "and any other part of Tennessee Code Annotated . . . relative to adoption, foster care, and adoption records," but making no changes to Section 37-1-166). The reasonable-efforts requirement remained in Title 37 as part of the juvenile statutes, addressing foster care and dependency and neglect proceedings, and was not expressly incorporated into Section 36-1-113, the new termination statute.

By November 1997, federal officials recognized that the prior AACWA goal of preserving and reunifying families had worked to the detriment of some children. They discovered that, in some cases, continued efforts to reunify the child with a parent who had

_____

[13] The new termination statute provided specifically that "[t]he prospective adoptive parent(s) of the child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, a court appointed special advocate (CASA) agency, or the department shall have standing to file a petition" to terminate a biological parent's rights. Tenn. Code Ann. § 36-1-113(b) (1996).

lost custody resulted in the child languishing in foster care for many years. This realization prompted enactment of the Federal Adoption and Safe Families Act of 1997 ("ASFA"). *In re C.B.*, 611 N.W.2d at 493 (citing *In re Lilley*, 719 A.2d at 332). The ASFA changed gears to "broaden[] the focus of reunification to place greater emphasis on the health and safety of the child, . . . mandate[] a permanent home for a child as early as possible[,] . . . [and] also eliminate[] the reasonable effort requirement for certain types of parental behavior." *Id.* (citing 42 U.S.C. § 675(5)(C); *In re Lilley*, 719 A.2d at 333). Thus, the ASFA shifted the federal objective from reunification to giving children a permanent home as soon as possible. Kathleen S. Bean, *Reasonable Efforts: What State Courts Think*, 36 U. Tol. L. Rev. 321, 335-36 (2005) (citing *In re C.B.*, 611 N.W.2d at 493).

Ever mindful of retaining federal funding for foster care, states again amended their statutes to comply with the ASFA. Tennessee's effort to comply with the federal mandates took the form of amending Section 37-1-166(g). Tennessee legislators were told that amending Section 37-1-166(g) was important to secure continued federal funding for foster care, and that it would also benefit children by expediting permanency. *See* Hearing on H.B. 2875, Before the House Children & Fam. Aff. Comm., 93d Gen. Assemb. (Tenn. Mar. 4, 1998) (testimony of Jane Chittick, Director of Adoptions at DCS). The amended statute redefined the term "reasonable efforts" to emphasize the child's health and safety and listed situations in which DCS did not have to make reasonable efforts to reunify the family.[14]

---

[14] Section 37-1-166(g) as amended provided:

(1) As used in this section, "reasonable efforts" means the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family. In determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making such reasonable efforts, the child's health and safety shall be the paramount concern.

(2) Except as provided in subparagraph (4), reasonable efforts shall be made to preserve and reunify families:

      (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

      (B) to make it possible for a child to safely return to the child's home.

(3) If continuation of reasonable efforts of the type described in subparagraph (2) is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child.

(4) Reasonable efforts of the type described in subparagraph (2) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that:

> (A) the parent has subjected the child that is the subject of the petition or any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home to aggravated circumstances as defined in Section 3 of this act;

> (B) as set out in Section 8 of this act, the parent has:

>> (i) committed murder of any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home;

>> (ii) committed voluntary manslaughter of any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home;

>> (iii) aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter of the child or any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home; or

>> (iv) committed a felony assault that results in serious bodily injury to the child or any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home; or

> (C) the parental rights of the parent to a sibling or half-sibling have been terminated involuntarily;

(5) If reasonable efforts of the type described in subparagraph (2) are not made with respect to a child as a result of a determination made by a court of competent jurisdiction in accordance with subparagraph (4):

> (A) a permanency hearing shall be held for the child within 30 days after the determination; and

> (B) reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child.

(6) Reasonable efforts to place a child for adoption or with a legal guardian may be made

1998 Tenn. Pub. Acts ch. 1097 (S.B. 3089); *see also* Debate on H.B. 2875, Before the House Children & Fam. Aff. Comm., 93d Gen. Assemb. (Tenn. Mar. 4, 1998) (statements of Rep. Scroggs). Incorporating language directly from the federal regulations, Section 37-1-166(g) as amended relieved DCS of its duty to provide reasonable efforts to reunify "if a court of competent jurisdiction has determined that" the child had been subjected to "aggravated circumstances." Tenn. Code Ann. § 37-1-166(g)(4)(A); *see* 45 C.F.R. § 1356.21.[15] At the time the Legislature amended Section 37-1-166(g) to include the aggravated-circumstances exception, it made no change to the recently enacted statute on termination of parental rights, Section 36-1-113.

Thus, as Tennessee statutes exist today, Section 37-1-166(g), contained in Title 37 on juveniles and addressing dependency and neglect proceedings, sets forth DCS's duty to make reasonable efforts to prevent the removal of children from their homes and to reunify parents and children in the event that removal becomes necessary. Section 36-1-113, contained in Title 36 on domestic relations and addressing general adoption proceedings, sets forth the grounds and procedures for terminating the parental rights of a biological parent.

### Parental Termination Cases and Reasonable Efforts

We next review Tennessee cases on termination of parental rights that involved the issue of whether DCS had made reasonable efforts to reunify the family after the child was removed from the home.

---

concurrently with reasonable efforts of the type described in subparagraph (2).

Tenn. Code Ann. § 37-1-166(g) (Supp. 1998).

[15] Tennessee's section 37-1-166(g) incorporates the following language from the relevant federal regulation:

(3) Reasonable efforts to prevent a child's removal from home or to reunify the child and family are not required if the [state] agency obtains a judicial determination that such efforts are not required because:

(i) A court of competent jurisdiction has determined that the parent has subjected the child to aggravated circumstances (as defined in State [law] . . ., which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse).

45 C.F.R. § 1356.21(b)(3)(i).

In cases decided after 1977 (when the termination statutes mentioned the the State's efforts to reunify only in the best-interest provisions) but before 1992 (when Tennessee codified the reasonable-efforts requirement in Section 37-1-166), the question of DCS's reasonable efforts to reunify the family did not figure prominently in Tennessee courts' decisions on whether to terminate parental rights.[16] Even after the Legislature codified the reasonable-efforts requirement in 1992, the extent of DCS's efforts to reunify the family was addressed in cases involving termination of parental rights only as a factor considered in the best-interest analysis.[17] *See Tenn. Dep't of Children's Servs. v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *5 (Tenn. Ct. App. Dec. 30, 2003); *In re A.W.*, 114 S.W.3d 541, 545-46 (Tenn. Ct. App. 2003); *Tenn. Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *Tenn. Dep't of Human Servs. v. Henry*, No. 02A01-9308-CV-00188, 1994 WL 704798, at *3-4 (Tenn. Ct. App. Dec. 19, 1994).

That picture began to change in 2004, starting with an unreported but nevertheless influential decision in *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326 (Tenn. Ct. App. Mar. 9, 2004). In that case, the Tennessee Court of Appeals discussed at length whether the State is required to prove that it fulfilled its duty to provide reasonable efforts under Section 37-1-166 in order to obtain termination of the parental rights of a biological parent.

In *In re C.M.M.*, two children were taken into DCS protective custody based on allegations of dependency and neglect.[18] *Id.* at *1. They were placed in the foster care of the

---

[16] In one early case, the Tennessee Court of Appeals held that a parent's rights could not be terminated "[i]n the absence of any proof to show that reasonable efforts had been made by DHS to reunite the family." *Tenn. Dep't of Human Servs. v. Caldwell*, No. 82-251-II, slip. op. at 14 (Tenn. Ct. App. May 18, 1983). This holding, however, was based on the statutory scheme in effect long before the 1992 codification of the reasonable-efforts requirement in Section 37-1-166, and also before the 1995 overhaul of the adoption statutes and the enactment of Section 36-1-113. Furthermore, the *Caldwell* court's decision was based on caselaw outside of Tennessee and not on any Tennessee authority. Perhaps for those reasons, *Caldwell* has not been widely cited, and it appears to be an anomaly. *But see In re Jeremy D.*, No. 01-A-01-9510-JV00479, 1996 WL 257495, at *3 (Tenn. Ct. App. May 17, 1996); *Tenn. Dep't of Human Servs. v. Amundsen*, No. 87-100-II, 1987 WL 18377, at *8 (Tenn. Ct. App. Oct. 14, 1987).

[17] The extent of DCS's efforts to reunify the family was also examined in cases where the ground for termination was abandonment by failure to provide a suitable home under Section 36-1-113(g)(1), and Section 36-1-102(1)(A)(ii). *See Baral v. Bombard*, No. M2000-02429-COA-R3-JV, 2002 WL 1256246, at *10 (Tenn. Ct. App. June 5, 2002).

[18] At the time DCS took the children into protective custody, the two children at issue and their three siblings were not living with their parents but with their maternal grandmother. *In re C.M.M.*, 2004 WL

petitioners, who were social acquaintances of the children's mother. The foster parents later filed a petition to terminate the parental rights of the children's parents. *Id.* at *2. The petitioners named DCS as a respondent, so it was made a party to the termination proceedings. *Id.* at *2 n.7. After a trial, the trial court granted the relief sought by the foster parents based on the first three grounds listed in the termination statute: abandonment,[19] substantial non-compliance with the parenting plan, and persistent conditions. *Id.* at *3 n.13. The mother appealed.

On appeal, the *In re C.M.M.* court underscored the importance of family to society and the General Assembly's policy of keeping families together where possible:

> The concept of family is one of the fundamental building blocks of our society. Tenn. Code Ann. § 36-3-113(a) (2001). Parental autonomy is the cornerstone of this concept. Thus, public policy strongly favors permitting parents to raise their children as they see fit, free from unwarranted governmental interference.
>
> Because of the importance of family relationships, the General Assembly has recognized that children should not be separated from their parents unless separation is necessary for the children's welfare or in the interest of public safety. Tenn. Code Ann. §§ 37-1-101(a)(3), 37-2-401(a) (2001). Even the statutes defining the circumstances when the State may intervene in the parent-child relationship reflect the General Assembly's policy decisions that separating parents and children should be a remedy of last resort, that the Department should make "reasonable efforts" to preserve, repair, or restore parent-child relationships whenever reasonably possible, and that the juvenile court must independently determine that the remedial efforts the Department proposes to engage in are reasonable.

*In re C.M.M.*, 2004 WL 438326, at *6 (citations omitted). After emphasizing the importance of the Section 37-1-166 directive that DCS make reasonable efforts to "preserve, repair, or restore" parent-child relationships, the court addressed the relationship between the statute on reasonable efforts and the statute governing termination of parental rights:

> There is a need to address the relationship between Tenn. Code Ann. § 36-1-113 and Tenn. Code Ann. § 37-1-166 regarding the Department's

438326, at *1.

---

[19] The type of abandonment found was not noted by the Court of Appeals in its decision.

obligation to preserve, repair, and restore parent-child relationships. The Department's brief implies that the "reasonable efforts" required by Tenn. Code Ann. § 37-1-166 are somehow qualitatively and quantitatively different from the "reasonable efforts" referred to in Tenn. Code Ann. § 36-1-113. The Department is not required in every case to preserve or repair the parent-child relationship. However, once the Department undertakes this obligation, the courts should employ the same standards to determine whether the Department's remedial efforts have been reasonable.

*Id.* at *5. The *In re C.M.M.* court held that "the 'reasonable efforts' required by Tenn. Code Ann. § 37-1-166 are precisely the same sort of 'reasonable efforts' required by Tenn. Code Ann. § 36-1-113 [the termination statute]." *Id.* at *7. To reach this conclusion, the *In re C.M.M.* court relied on the maxim *in pari materia*, that is, statutes must be construed together when they relate to the same subject matter and share a common purpose. It found that Section 37-1-166 on reasonable efforts shared a common purpose with Section 36-1-113 on termination of parental rights.[20] *Id.* at *7.

The *In re C.M.M.* court recognized that DCS "is not required in every case to preserve or repair the parent-child relationship." *Id.* at *5. However, the court held, "when the termination proceeding involves grounds that implicate [DCS's] obligation, establishing that it made reasonable efforts to reunite the child with his or her parents is an *essential ingredient* of the Department's case." *Id.* at *7 (emphasis added) (footnote omitted). Typically, it stated, reasonable efforts by DCS are required in termination cases that are based on the first three grounds listed in the termination statute, that is, abandonment,[21] substantial noncompliance with the permanency plan, and persistent conditions. *In re C.M.M.,* 2004 WL 438326, at *7 n.27.

The *In re C.M.M.* court further held that, in cases in which the termination petition alleges grounds that implicate DCS's obligation to make reasonable efforts to reunify, DCS bears the burden of proving that it made reasonable efforts pursuant to Section 37-1-166(b)[22]

---

[20] The *In re C.M.M.* court noted that "the interlocking relationship between" the reasonable-efforts statute and the termination statute is "reflected in each statute's references to the other." *In re C.M.M.*, 2004 WL 43826, at *7 n.22.

[21] In making this general statement, the court did not differentiate among the various definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A).

[22] Subsection (b) states: "Whenever a juvenile court is making the determination required by subsection (a) [regarding custody], the department has the burden of demonstrating that reasonable efforts have been made to prevent the need for removal of the child or to make it possible for the child to return

"even when the parent has not questioned the adequacy of its efforts." *In re C.M.M.,* 2004 WL 438326, at *7. In such instances, it stated, DCS "must establish that it has made reasonable efforts to reunite the child with his or her parents *by clear and convincing evidence.*" *Id.* at *8 (emphasis added) (citing Tenn. Code Ann. § 36-1-113(c)). On the facts of that case, the *In re C.M.M.* court reversed the termination of the mother's parental rights because DCS did not establish by clear and convincing evidence that it had made reasonable efforts to reunify the mother with her children.[23] *Id.* at *9.

Similarly, in *In re Tiffany B.*, the parents of the children at issue were drug addicts who turned to petty crime to support their habit; when not incarcerated, they were homeless and unemployed. *In re Tiffany B.*, 228 S.W.3d 148, 151-52 (Tenn. Ct. App. 2007). The children were taken into DCS protective custody and placed in foster care, and DCS later filed a petition to terminate their parental rights. After a hearing, the trial court terminated the parental rights of both parents based on the first three grounds listed in the termination statute: abandonment,[24] substantial noncompliance with the permanency plan, and persistent conditions. *Id.* at 154. Both parents appealed the termination of their parental rights.

On appeal, the *In re Tiffany B.* court emphasized that children's well-being hinges on DCS's efforts to assist their parents: "The welfare of children living in a family setting is inextricably linked to their parents' ability to care for them." *Id.* at 157. "[O]ne of the most effective ways to improve the lives of dependent and neglected children," the court observed, "is to improve the ability of their parents to be nurturing caregivers." *Id.* The opinion detailed DCS's responsibility to develop a permanency plan for every dependent and neglected child and to make reasonable efforts to help parents rehabilitate themselves and become better able to provide their children with a safe and stable home. *Id.* at 157-59.

The appellate court in *In re Tiffany B.* deemed DCS's efforts in that case to be lacking. A review of the evidence in the record, the opinion stated, left the court with "a distinct impression that [DCS] did not expend much effort either to locate or to assist either [parent] after it obtained custody of" the child, but instead expected the cocaine-addicted, homeless, unemployed parents to initiate remedial efforts on their own. *Id.* at 160. The appellate court reversed the termination as to both parents because DCS failed to prove "by

---

home." Tenn. Code Ann. § 37-1-166(b).

[23] The *In re C.M.M.* court did not explain why DCS would bear the burden of proving reasonable efforts in a case in which the termination petition was filed by the foster parents, not DCS.

[24] The trial court in *In re Tiffany B.* found three types of abandonment: failure to visit, failure to pay support, and failure to provide a suitable home. *In re Tiffany B.*, 228 S.W.3d at 154.

clear and convincing evidence" that it had made reasonable efforts to assist the parents and reunify the family.[25]  *Id.*

In the wake of the *In re C.M.M.* and *In re Tiffany B.* decisions, in cases filed by DCS to terminate parental rights, many courts began requiring DCS to prove that it had made reasonable efforts to assist the respondent parent.  Consistent with the language in *In re C.M.M.* on termination grounds for which reasonable efforts was "implicated," these cases typically involved one of the first three grounds listed in the termination statute.  *See, e.g.*, *In re Arteria H.*, 326 S.W.3d 167, 178-79 (Tenn. Ct. App. 2010); *In re R.L.F.*, 278 S.W.3d 305, 315-16 (Tenn. Ct. App. 2008); *In re Giorgianna H.*, 205 S.W.3d at 518; *see also In re Zeylon T.S.*, No. E2011-00287-COA-R3-PT, 2011 WL 5052957, at *10 (Tenn. Ct. App. Oct. 24, 2011); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *12 n.13 (Tenn. Ct. App. June 30, 2005); *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004).

This Court has not addressed directly whether DCS is required to prove that it made reasonable efforts to assist to reunify the parent and child as a precondition to termination.  In *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010), this Court discussed the reasonable-efforts requirement in the context of a termination case but did not address the precise issue presented here.

In *In re Bernard T.*, the putative father's parental rights were terminated based on failure to comply with the parenting plan, persistent conditions, and failure to establish paternity.  *Id.* at 594-95.  On appeal, a majority of the intermediate appellate court reversed the termination because the record did not establish that DCS had made reasonable efforts to assist the father in maintaining stable housing and income, nor that it had assisted the father in establishing his paternity.  *Id.* at 595.

On appeal to this Court in *In re Bernard T.*, we opined that this was "the first occasion for this Court to address the Department's statutory obligation to use 'reasonable efforts' to preserve, repair, and restore parent-child relationships whenever the circumstances require the Department to intervene in family matters," particularly with regard to persons who are not legal parents.  *Id.* at 599-600.  The *In re Bernard T.* Court recognized that the duty to provide reasonable efforts "arises when [DCS] first separates the child from his or her parents," and that this statutory duty "plays an important role" in termination proceedings.  *Id.* at 600.  It stated that DCS's duty to make reasonable efforts to assist parents typically arises in cases that involve the first three grounds listed in the termination statute.  The Court observed that, when

---

[25] The appellate court did not dismiss the termination petition but instead remanded the case to the trial court to permit DCS to put on additional proof of its efforts to assist the parents.  *Id.* at 160 n.21.

reasonable efforts are required in a given case, DCS may demonstrate that it fulfilled its duty to establish that termination is in the child's best interest under the second factor in Section 36-1-113(i)(2). *Id.* Ultimately, the Court reversed the decision of the Court of Appeals because the record contained clear and convincing evidence that DCS made reasonable efforts to assist the putative father. *Id.* at 606. Thus, the Court in *In re Bernard T.* discussed reasonable efforts in the context of a termination proceeding, but it stopped short of holding that, to obtain termination of parental rights, the State is required to prove by clear and convincing evidence that it made reasonable efforts to assist the respondent parent.

Still based on the premise that DCS is required to prove reasonable efforts in termination cases involving certain grounds, some courts have held that DCS could satisfy its burden of proof by establishing *either* that it made reasonable efforts *or* that making reasonable efforts to assist the parent would have been futile. *See In re Q.D.B.*, No. W2008-01933-COA-R3-PT, 2009 WL 1362311, at *3 (Tenn. Ct. App. May 15, 2009); *In re T.L.N.*, No. M2008-01151-COA-R3-PT, 2009 WL 152544, at *6 (Tenn. Ct. App. Jan. 21, 2009); *Tenn. Dep't of Children's Servs. v. Estes (In re Q.E.)*, 284 S.W.3d 790, 800 (Tenn. Ct. App. 2008); *In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *11 (Tenn. Ct. App. Dec. 13, 2007).

In still other parental termination cases, as demonstrated by the intermediate appellate decision below, DCS has sought to avoid being required to prove reasonable efforts to reunify the family by showing that there were "aggravated circumstances" that absolved it of the duty to make such efforts. *See* Tenn. Code Ann. § 36-1-102(9); *id.* § 37-1-166(g)(4). Often this has occurred in cases where the ground for termination is the one at issue in the instant case—abandonment by conduct prior to incarceration that exhibits wanton disregard for the child's welfare.[26] *See In re Dacia S.*, No. E2012-01337-COA-R3-PT, 2013 WL 709635, at *9 (Tenn. Ct. App. Feb. 26, 2013); *In re Zada M.*, No. E2010-02207-COA-R3-PT, 2011 WL 1361575, at *5 (Tenn. Ct. App. Apr. 11, 2011); *In re Arteria H.*, 326 S.W.3d at 183; *In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *4 (Tenn. Ct. App. Dec. 22, 2009) (citing *In re B.P.C.*, No. M2006-02084-COA-R3-PT, 2007 WL 1159199, at *11 & n.5 (Tenn. Ct. App. Apr. 18, 2007)).

---

[26] A few courts have held that other types of abandonment—abandonment by failure to visit or failure to support—if proven, constitute an "aggravating circumstance" that relieves DCS of its obligation to make reasonable efforts to reunify. *In re Natasha A.*, No. M2012-01351-COA-R3-PT, 2013 WL 776211, at *4 (Tenn. Ct. App. Feb. 27, 2013), *perm. app. denied* (Tenn. May 21, 2013); *Tenn. Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *6 (Tenn. Ct. App. Aug. 31, 2007); *Tenn. Dep't of Children's Servs. v. D.D.T.*, No. M2006-00671-COA-R3-PT, 2006 WL 2135427, at *4 (Tenn. Ct. App. July 31, 2006).

Meanwhile, in cases in which the subject child was never taken into DCS custody and a private party filed a petition to terminate the parental rights of a biological parent, the private-party petitioner has not been required to prove reasonable efforts to reunify as a precondition to termination. *See In re Jacobe M.J.*, 434 S.W.3d 565, 575 (Tenn. 2013); *In re M.L.P.*, 281 S.W.3d 387, 391-92 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d at 813; *In re F.R.R., III*, 193 S.W.3d 528, 530-31 (Tenn. 2006); *Jones v. Garrett*, 92 S.W.3d 835, 839-40 (Tenn. 2002); *In re Audrey S.*, 182 S.W.3d at 876-77, 883; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004). This holds true even in cases in which the subject child was at some point taken into DCS custody—the private-party petitioner was nevertheless not required to establish reasonable efforts as part of his case.[27] *See In re D.L.B.*, 118 S.W.3d 360, 364, 368 (Tenn. 2003); *In re Swanson*, 2 S.W.3d 180, 182 (Tenn. 1999); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 172 (Tenn. 1996); *In re London V.P.*, No. E2010-02650-COA-R3-PT, 2011 WL 4477997, at *1 (Tenn. Ct. App. Sept. 9, 2011); *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *1-3 (Tenn. Ct. App. June 16, 2011); *In re J.G.H., Jr.*, No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *6, *16 (Tenn. Ct. App. Aug. 17, 2009); *In re J.R.B.*, No. M2007-00442-COA-R3-PT, 2007 WL 3244637, at *4 (Tenn. Ct. App. Nov. 2, 2007); *Stokes v. Arnold*, 27 S.W.3d 516, 519, 521 (Tenn. Ct. App. 2000).

Regardless of whether the petitioner is DCS or a private party, all of these cases apply the same statute, Section 36-1-113, which governs termination of parental rights.

## Interpretation of Section 36-1-113

We have reviewed the legislative history of the statutes on reasonable efforts and termination of parental rights, as well as the caselaw addressing reasonable efforts in the context of termination of parental rights. We now examine whether DCS must prove reasonable efforts to assist the respondent parent in order to obtain termination of parental rights. This task requires us to interpret Section 36-1-113, the statute governing termination of parental rights.

In doing so, we are guided by the familiar rules of statutory construction. "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)). "The text of the statute is of primary importance." *Mills v. Fulmarque*, 360 S.W.3d 362, 368 (Tenn. 2012). A statute should be read naturally and

___

[27] Interestingly, the only termination case we have discovered in which a private-party petitioner was required to establish that DCS made reasonable efforts at reunification is *In re C.M.M.*, discussed herein. *In re C.M.M.*, 2004 WL 438326, at *8.

reasonably, with the presumption that the legislature says what it means and means what it says. *See BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997).

Statutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both. "[T]he construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute." *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010) (quoting *Wilson v. Johnson Cnty.*, 879 S.W.2d 807, 809 (Tenn. 1994)). We seek to adopt the most "reasonable construction which avoids statutory conflict and provides for harmonious operation of the laws." *Carver v. Citizen Utils. Co.*, 954 S.W.2d 34, 35 (Tenn. 1997). Issues of statutory interpretation present a question of law, which we review de novo on appeal, giving no deference to the lower court decision. *Mills*, 360 S.W.3d at 366; *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

We begin by looking at the language of Section 36-1-113. The statute provides that, in order to obtain termination of the parental rights of a biological parent, a petitioner must prove two elements by clear and convincing evidence: (1) at least one of the listed grounds for termination, and (2) that termination of parental rights is in the child's best interest.[28] Tenn. Code Ann. § 36-1-113(c); *see In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d at 392; *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re F.R.R., III*, 193 S.W.3d at 530; *Jones*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Adoption of E.N.R.*, 42 S.W.3d 26, 29 (Tenn. 2001). Grounds for termination and consideration of the child's best interest are the only two elements expressly listed in Section 36-1-113.

Section 36-1-113 does not include DCS's reasonable efforts to reunify as a required element to be established along with grounds and best interest. Rather, reasonable efforts is

---

[28] Pursuant to section 36-1-113(c):

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). The party petitioning for termination has the burden of making both of these showings. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010) (citing *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004); *In re S.M.*, 149 S.W.3d at 639).

referenced in one of the factors to be weighed in determining whether termination of parental rights is in the child's best interest. Section 36-1-113 directs a court to consider whether the parent "has failed to effect a lasting adjustment *after reasonable efforts*" have been made. Tenn. Code Ann. § 36-1-113(i)(2) (emphasis added). As noted in our earlier discussion, the reasonable-efforts factor in the best-interest determination has been in the statutory framework from as early as 1977.

Apart from the reference in one of the best-interest factors, the phrase "reasonable efforts" appears only tangentially in Section 36-1-113. The definition of one ground for termination, abandonment, mentions reasonable efforts. *Id.* §§ 36-1-113(g)(l), -102(1)(A)(ii).[29] In addition, Section 36-1-113 provides that DCS *may* elect not to file a petition to terminate parental rights if it has not yet made reasonable efforts to reunify the parent and child. *Id.* § 36-1-113(h)(2)(C).[30] Section 36-1-113 does not otherwise refer to DCS's obligation to make reasonable efforts to reunify the child with the parent.

Section 37-1-166, found in the dependency and neglect statutes, defines "reasonable efforts" and outlines DCS's obligation to make reasonable efforts to assist the biological parent

---

[29] Reasonable efforts is mentioned in the second definition of the five definitions of abandonment, namely, abandonment by failure to provide a suitable home:

> (ii) The child has been removed from the home of the . . . parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made *reasonable efforts* to assist the . . . parent or parents or a guardian or guardians to establish a suitable home for the child, but that the parent or parents or guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added).

[30] We note that the language in this provision is permissive; that is, DCS is not required to forgo the filing of a termination petition if it has not made reasonable efforts to assist the parent.

in order to reunify the parent with the child. *Id.* § 37-1-166(g)(1). As noted above, the aggravated-circumstances exception relieves DCS of this obligation when a court of competent jurisdiction determines that aggravated circumstances, as defined in Section 36-1-102(a), are involved. Section 37-1-166 does not explicitly reference the termination statute.

Thus, nothing in the plain language of Section 36-1-113 indicates that a petitioner in a proceeding to terminate parental rights is in fact required to put on proof of DCS's reasonable efforts to assist the respondent parent. Rather, the language of the statute indicates only that the trial court is to consider DCS's reasonable efforts, or the lack thereof, in determining whether termination of the parent's rights is in the child's best interest.[31] *See id.* § 36-1-113(i)(2). Likewise, Section 37-1-166, which details DCS's obligation to make reasonable efforts in a dependency and neglect proceeding, contains no language indicating that proof of reasonable efforts is required in a termination proceeding. In cases in which DCS removes a child from the home, Section 37-1-166 generally directs DCS to make reasonable efforts to reunify the parent with the child unless DCS can show that it is not required to do so. Nothing in Section 37-1-166, however, addresses proof on reasonable efforts in a *termination* proceeding.

Reading Section 36-1-113 *in pari materia* with Section 37-1-166, the Court of Appeals in *In re C.M.M.* concluded that, if DCS is directed under Section 37-1-166 to make reasonable efforts to reunify in the context of a dependency and neglect proceeding, then *ergo*, in any ensuing termination proceeding, DCS must prove that it made such reasonable efforts as to the respondent parent. *In re C.M.M.*, 2004 WL 438326, at *7. The *In re C.M.M.* court reasoned that Section 37-1-166(b) "applies to any proceeding to determine whether a child should remain in [DCS's] custody." *Id.* at *7 n.28. The court found this provision broad enough to include termination proceedings "because these [termination] proceedings result in placing the child in [DCS's] custody prior to adoption." *Id.*

We must respectfully disagree. Neither the language of Section 36-1-113 nor its legislative history bears out this interpretation. First, Section 37-1-166 does not apply to "any proceeding," but rather it applies only in "any proceeding of a *juvenile court* ." Tenn. Code Ann. § 37-1-166(a) (emphasis added). While the juvenile court has exclusive original jurisdiction over dependency and neglect proceedings, circuit and chancery courts have concurrent jurisdiction with the juvenile court in actions to terminate parental rights. *Id.* § 36-1-113(a). Limiting the application of Section 37-1-166 to juvenile court actions indicates legislative intent that it apply only in dependency and neglect actions.

---

[31] As noted above, if the petitioner in a termination proceeding seeks to rely on the ground of abandonment by failure to provide a suitable home, DCS's reasonable efforts are mentioned specifically in the definition of that ground for termination. Tenn. Code Ann. § 36-1-113(g)(l); *id.* § 37-1-102(l)(A)(ii).

In addition, Section 36-1-113 does not include reasonable efforts in the grounds for termination or otherwise require proof of reasonable efforts as a precondition to termination. In discerning legislative intent, we may employ the principle of "*expressio unius est exclusio alterius*, [which] provides 'that where the legislature includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that the legislature acted purposefully in the subject included or excluded.'" *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013) (quoting *State v. Loden*, 920 S.W.2d 261, 265 (Tenn. Crim. App. 1995)). At the time Section 36-1-113 was enacted, states were free to adopt termination statutes that expressly require a showing of reasonable efforts in termination proceedings, and a number of states did just that. Tennessee did not do so.[32] Instead, Tennessee's Legislature chose to make reasonable efforts one of the enumerated factors for the trial court to weigh in determining the child's best interest.[33]

The Legislature's choice to include reasonable efforts only in the factors to be considered in the best-interest analysis evidences an intent *not* to make proof of reasonable efforts a precondition to termination of parental rights. This is so even if reasonable efforts to reunify were required in the related dependency and neglect proceedings. We read Sections 37-1-166 and 36-1-113 *in pari materia,* but we must also respect the clear language of each provision. Accordingly, we overrule the holding in *In re C.M.M.* insofar as it required DCS to prove by clear and convincing evidence, as a precondition to obtaining termination of parental rights, that it made reasonable efforts to reunify the family.[34]

In addition to its reliance on the plain language of the statutory scheme, the State argues that it is anomalous to interpret Section 36-1-113 to require DCS to prove reasonable efforts by clear and convincing evidence, but not require similar proof from a private party who files

---

[32] As noted above, proof of reasonable efforts is required to prove the ground of abandonment by failure to provide a suitable home. Even under that ground for termination, DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii).

[33] Moreover, if reasonable efforts is viewed as a stand-alone component of the required proof, this makes superfluous the General Assembly's inclusion of reasonable efforts in the factors to be weighed in the best-interest analysis. In other words, in any case in which DCS was required under the dependency and neglect statutes to make reasonable efforts to assist the respondent parent and its efforts are deemed lacking, the trial court would never reach the question of the child's best interest to weigh the reasonable-efforts factor in its best-interest determination.

[34] Likewise, we overrule the holding of *In re Tiffany B.* and other cases following the holding in *In re C.M.M.* to the extent that the courts required DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights. *See In re Tiffany B.*, 228 S.W.3d at 160.

a petition for termination of parental rights, because the same statute applies regardless of whether DCS is the petitioner. We agree. Nothing in the statutes or the legislative history indicates that the Legislature intended to create an additional barrier to permanency for children in termination cases in which DCS is the petitioner. This is further indication that the Legislature did not intend for Section 36-1-113 to be interpreted to require proof of reasonable efforts in a termination proceeding.

For these reasons, we hold that, in a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.*, 205 S.W.3d at 516; *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

In reaching this conclusion, we do not seek to minimize the importance of DCS's efforts to assist parents who lose custody of their child and seek to regain it. We agree with the observation in *In re C.M.M.* that:

> In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.

*In re C.M.M.*, 2004 WL 438326, at *7 (citations omitted). In a given parental termination case, the best-interest factor regarding DCS's efforts to assist the respondent parent may be determinative, i.e., DCS's lack of reasonable efforts may weigh heavily enough to persuade the trial court that termination of the parent's rights is not in the best interest of the subject child. Nevertheless, the extent of DCS's efforts remains a factor to be weighed in the best-interest analysis, not an essential element that must be proven in order to terminate the parental rights of the respondent parent. *See In re B.S.G.*, No. E2006-02314-COA-R3-PT, 2007 WL 1514958, at *9 (Tenn. Ct. App. May 24, 2007).

We arrive at this conclusion with great care, recognizing the impact of a judicial decree to terminate the parental rights of a biological parent. No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn. Code Ann. § 36-1-113(l); *see M.L.B. v. S.L.J.*, 519 U.S. 102, 118-19 (1996); *In re Knott*, 197 S.W. 1097, 1098 (Tenn. 1917); *In re Giorgianna H.*, 205 S.W.3d at 515. We are, however, constrained to interpret statutes in a way that comports with the clear language chosen by our Legislature.

The Court of Appeals reversed the termination of Father's parental rights because (1) DCS had a duty to make reasonable efforts to reunify Father and Kaliyah, and (2) DCS was not relieved of its duty to make reasonable efforts until a court of competent jurisdiction found aggravated circumstances. Therefore, the Court of Appeals went on to address whether DCS had proven by clear and convincing evidence that it made reasonable efforts to support the petition for termination. Under our holding, DCS was not required in the termination proceedings to prove that it made reasonable efforts to assist Father, even if it had such a duty in the custody/dependency and neglect proceedings.[35]

The question of whether DCS made reasonable efforts to assist Father remained, of course, one of the factors considered by the trial court in its best-interest analysis. In this appeal, Father does not challenge the juvenile court's determination that termination of his parental rights is in Kaliyah's best interest.[36] Therefore, this issue is waived. Because the State established by clear and convincing evidence one ground for termination of Father's parental rights and that termination of Father's rights is in Kaliyah's best interest, we reinstate the juvenile court's termination of Father's parental rights as to Kaliyah.

---

[35] We note some question as to whether DCS had a duty to make reasonable efforts to assist Father under Section 37-1-166(g), since Kaliyah never lived with Father and therefore was never removed from his custody. *See* Tenn. Code Ann. § 37-1-166 (referring to DCS's efforts to "reunify" families and make it possible for the child to "safely return to the child's home"). Based on our holding in this case, however, we need not address this issue.

[36] Father did not challenge the juvenile court's best-interest determination in his appeal to the intermediate appellate court. The issues Father raised to the Court of Appeals were (1) whether the trial court erred in concluding that DCS was not required to make reasonable efforts prior to terminating Father's parental rights, and (2) whether DCS made reasonable efforts at reunification. *See In re Kaliyah S.*, 2014 WL 819419, at *2. Likewise, Father did not challenge the juvenile court's best interest determination in this Court; he claims instead that DCS was not relieved of its duty to make reasonable efforts under Section 37-1-166(g)(4)(A).

**CONCLUSION**

The decision of the Court of Appeals is reversed, and the decision of the juvenile court is reinstated. Costs on appeal are to be taxed to Respondent/Appellee Rontez L., for which execution may issue, if necessary.

_____
JUSTICE HOLLY KIRBY