IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 30, 2015

IN RE M.P.H.

Appeal from the Juvenile Court for Meigs County
No. 2014-JC-3         Jayne Johnston-Crowley, Judge

_____

No. E2014-02267-COA-R3-PT-FILED-JUNE 15, 2015
_____

J.L.W. (Mother) appeals from the order terminating her parental rights to her minor daughter, M.P.H. (the Child).[1]  Based on evidence of Mother's drug abuse, the Department of Children's Services (DCS) removed the Child from Mother's custody and placed her in foster care.  The Child was later adjudicated dependent and neglected. Eighteen months after the Child's removal, DCS filed a petition to terminate each of her parents' rights.  After a trial, the court granted the petition.  As to Mother, the court found, by clear and convincing evidence, that (1) multiple grounds for termination exist, and (2) termination is in the Child's best interest.  Mother challenges each of these determinations.   We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Wilton Marble, Cleveland, Tennessee, for the appellant, J.L.W.

Herbert H. Slatery, III, Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] In the same proceeding, the trial court terminated the parental rights of the Child's biological father, T.W. (Father).   Father did not appeal the order.

# OPINION

## I.

During their brief relationship, Mother and Father used methamphetamine together. Soon after Father was incarcerated on drug charges, Mother discovered she was pregnant. Around the same time, Mother moved in with her new paramour, J.H. The Child was born to Mother in September 2007. At that time, Father remained incarcerated. J.H. was listed as the Child's father on her birth certificate. In March 2009, the Child was first placed in state custody as a result of Mother's illicit drug use. Mother regained custody some ten months later. In 2011, DNA testing confirmed Father's paternity of the Child. In June 2012, Child Protective Services (CPS) investigated new allegations that the Child was drug exposed and lacked supervision. After Mother failed a drug screen, she became "mad" in general and was unwilling to discuss a temporary placement for the night with a relative, so the Child was taken into state custody. In September 2012, the Child, as stipulated by Mother, was adjudicated dependent and neglected as a result of Mother's drug abuse. On January 2, 2014, some eighteen months after the Child's removal, DCS filed a petition to terminate Mother's parental rights. A one-day bench trial was held on August 29, 2014.

The proof at trial generally focused on Mother's choices and life decisions leading up to and since the Child's removal. Following high school graduation, Mother completed vocational training in 2002 to become a certified nurse anesthetist. Mother, thirty-three at trial, testified that she began using methamphetamine at twenty-five and continued until the Child was removed the first time. Mother testified she completed a drug treatment program in 2009, stayed drug-free for the next two years, then resumed her drug use, and lost custody again. Following the most recent custody episode, Mother continued her habit and tested positive for methamphetamine in May 2013, and again in November. Mother's drug use led to a criminal history. In 2006, she was convicted of three misdemeanor drug-related offenses; in 2007, she was convicted of simple possession of methamphetamine; and in 2013, she was jailed on a probation violation after failing a drug screen. At trial, Mother testified that she would not be surprised to learn that the Child had reported being afraid while she lived with Mother and had memories of hiding from the police and moving homes to avoid "bad people."

The removal of the Child was not Mother's first involvement with DCS. At the time of trial, Mother had five children in all, each with a different father, and none were in her legal custody. In September 2011, Mother began a new relationship with a J.W., a married man. She characterized their relationship as "volatile" and "rough" for the first year and a half, with physical aggression between them and J.W. being mentally abusive toward her. Mother and J.W. had a child together. In March 2013, the infant was

removed from their home after repeated domestic disturbances at least six times in which police were summoned. In March 2014, Mother and J.W. were married.

In June 2012, DCS developed a permanency plan with a goal of returning the Child to Mother. The plan required Mother to maintain visitation, pay child support, undergo an alcohol and drug assessment and follow all recommendations, submit to random drug screens and remain drug-free; maintain stable housing, stable income and provide proof of income to DCS. According to the case manager, Mother signed the plan, repeatedly agreed to do certain tasks, but never did, and sometimes "disappeared" for weeks at a time.

In November 2012, the Child's case was transferred to DCS case manager Wallace Fowler. Initially, Mother made progress and, by early 2013, Mr. Fowler felt that "things were looking very good." Mother passed two drug screens, was employed part-time at a retail store, and began attending Narcotics Anonymous meetings. Mother visited the Child consistently and case managers observed her to interact well with the Child, although Mother was often late and sometimes distracted by her guests or her cell phone during visits. Mother was granted unsupervised visits and DCS made plans to return the Child to Mother on a trial basis. According to Mr. Fowler, by March 2013, Mother's and J.W.'s relationship "exploded" and they began hurling accusations and filing complaints and petitions against each other. In May, Mother failed a drug screen, and in June she was arrested for assaulting J.W. By June 2013, the Child's trial home placement was cancelled; Mother was then staying with a friend, and she had not worked since having the baby. For three to four months, Mother missed many visits with the Child, before resuming more regular contact in the summer of 2013. Mr. Fowler testified he initiated termination proceedings because the Child was in foster care for over a year when Mother, within a 90-day span, essentially went from being ready to regain custody to spiraling downward – she lost stable housing and was unemployed, tested positive for methamphetamine, and was arrested and jailed for a month. Despite pursuing termination, Mr. Fowler referred Mother for a clinical parenting assessment to look for an underlying reason for her instability and repeated failure to achieve reunification with the Child. At trial, Mr. Fowler agreed that most recently, Mother had shown renewed progress: In 2014, she passed voluntary drug screens, was employed for the past nine months, had suitable housing with J.W., and completed outpatient drug treatment. Mr. Fowler admitted that, as of the trial date, Mother appeared to be in a stable situation and had completed most requirements of the permanency plan.

Dr. William Wray testified as an expert clinical and developmental psychologist. In June 2013, Dr. Wray evaluated Mother to determine her psychological stability and ability to parent. He found no evidence of any mental condition, but concluded that Mother had a "mixed" personality disorder as evidenced by her "fairly tumultuous lifestyle changes" and erratic behavior to that point. His formal diagnosis was "personality

disorder NOS (not otherwise specified)," a chronic, long-term disorder characterized by emotional and behavioral instability. Beginning in August 2013, Mother attended counseling sessions with Angela Womack, an alcohol and drug counselor, regarding her methamphetamine use and her relationship with J.W. Over a two-month period, Ms. Womack counseled Mother and J.W. some ten times, most often when they called during an altercation. After two months, no real progress was made. Ms. Womack discontinued the sessions following a particularly heated dispute during which Mother and J.W. argued and began throwing objects around the house and Mother accused Ms. Womack of sleeping with J.W.

At the time of trial, the Child was seven. She had been in foster care for half her life, and had remained with the same, pre-adoptive foster family for the past two years. Her case manager observed her to be well-adjusted there, with no special needs or concerns. The Child shared a home with her foster parents' three biological children and two other recently adopted siblings. Foster mother testified that all the children interacted well and thought of each other as brothers and sisters.

For her part, Mother remained living with J.W. and they were awaiting a hearing regarding custody of their child. According to Mother, their rental home was in foreclosure and they had not made a payment the past two months because they planned to buy a home of their own with a loan that Mother's grandfather had cosigned. Mother was planning to change jobs within the same health care company, but had not yet informed her current supervisor. She admitted she had been "written up" a few times at work for things she claimed were not her responsibility. Asked how she could be sure that she would not relapse again, Mother asserted that this time was "different" in that she "finally just grew up out of it" and wanted her children back.

At the conclusion of the trial, the court terminated Mother's parental rights. The court found clear and convincing evidence of grounds for termination based on (1) Mother's failure to comply substantially with the terms of a permanency plan and (2) a persistence of the conditions that led to the Child's removal. *See* Tenn. Code Ann. § 36-1-113(g)(2),(3)(2014). Also by clear and convincing evidence, the court found that termination is in the Child's best interest. Mother filed a timely notice of appeal.

II.

Mother raises issues for our review that we restate slightly, as follows:

> 1. Did the trial court err by finding that grounds for termination
> were proven by clear and convincing evidence?
> 2. Did the trial court err by considering evidence that was

irrelevant or otherwise inadmissible?

3. Did the trial court err by finding that there was clear and convincing evidence to show that termination is in the best interest of the Child?

III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011–00517–COA–R3–PT, 2011 WL 4553233 at *11–12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's judgment of witness credibility, which determinations will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

IV.

A.

The trial court terminated Mother's parental rights on two grounds – substantial noncompliance with a permanency plan and "persistence of conditions."[2] As to the former, Section 36-1-113(g)(2) provides grounds for termination where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan. . . ." This Court has repeatedly held that "when DCS is relying on substantial noncompliance with the permanency plan as a ground for termination of parental rights, it is essential that the plan be admitted into evidence." *In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284 (Tenn. Ct. App. E.S., filed Nov. 28, 2006). In an earlier case, we similarly emphasized the importance of admitting the plan into evidence. Our remarks bear repeating herein:

> Needless to say, the permanency plan must be admitted into evidence before the trial judge can consider it and it must be properly included in the record on appeal before we can consider it. The permanency plan was not admitted into evidence at any time during the trial… Tenn. R. Juv. P. 28(c) requires the proper admission of documents into evidence before they can be considered by the trial judge. Although various witnesses referred in their testimony to the permanency plan and its contents, their testimony was only an incomplete and vague description of the contents of the plan. Without the plan in evidence, the trial judge could not have properly made the required factual determinations regarding the plan. Without the plan in evidence, we do not have an adequate record from which to review the trial court's decision. DCS had the burden of producing clear and convincing evidence that the requirements of the permanency plan involving Mother's children were reasonable and related to remedying the conditions that necessitated the children's removal from her custody; that DCS had made reasonable efforts to assist Mother in complying with the plan; and that Mother had failed to substantially comply with the plan.

---

[2] Of the remaining alleged grounds, the State elected not to pursue one – abandonment by non-support – and the trial court found that DCS failed to establish the other – abandonment by failure to establish a suitable home. *See* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(ii),(iii).

***Dep't of Children's Services v. D.W.J.***, No. E2004-02586-COA-R3-PT, 2005 WL 1528367, at *3 (Tenn. Ct. App. E.S., June 29, 2005). Simply put, our case law holds that DCS cannot meet its burden of proof with respect to allegations of substantial noncompliance with a permanency plan where the plan is not introduced into evidence and made part of the record at trial.

In the present case, the permanency plan was not admitted at trial and is not before us. Recognizing the deficiency of the proof, DCS asserts that it will not defend the finding of substantial noncompliance as a ground for termination. Accordingly, we proceed on our review, mindful that only a single statutory ground must be clearly and convincingly established in order to justify a basis for termination. ***In re Audrey S***., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

B.

The trial court terminated Mother's rights to the Child pursuant to Tenn. Code Ann. §36-1-113(g)(3), the ground commonly referred to as "persistence of conditions." *See **In re Audrey S***., 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). Persistence of conditions applies in the following circumstances:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). This Court has further elaborated:

> The goal of the persistence of conditions ground is to avoid

having a child in foster care for a time longer than reasonable for the parent to demonstrate her ability to provide a safe and caring environment for the child. *In re Arteria H*., 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds, In re Kaliyah S*., No. E2013-01352-SC-R11-PT, 2015 WL 273659 (Tenn. Jan. 22, 2015).

Persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S*., 182 S.W.3d at 874. The question before the court is "the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care . . . ." *In re K.A.H*., No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

*In re Malaki E*., No. M2014-01182-COA-R3-PT, 2014 WL 1384652 at *9 (Tenn. Ct. App. M.S., filed Mar. 23, 2015).

As to Mother, the trial court found a persistence of conditions, as follows:

[Mother's] failure to maintain safe and stable relationships and her relapses into drug usage during the tenure of this case are the same conditions that led to [the Child's] removal and they still persist. [The Child] has been in DCS custody for over 3 years total and based on the proof before the Court, there is little likelihood these conditions will be remedied at an early date so that the child can be safely returned to [Mother's] custody.

In further support of its finding of persistence of conditions, the trial court explained:

I have to look to more than just the immediate circumstances that obtain today. If there had been even a relatively even progression from the conditions that required removal to today's hearing, the argument that mom is now stable would be far more compelling, much stronger. But there haven't just been glitches.

I found not only the clinical psychological evidence presented by Dr. Wray to be compelling, but I found that that information

-8-

was also very much supported again by the testimony of the . . . . . counselor that the social relationship between [Mother and J.W.] before and now, . . . has been consistently characterized by violence against property as well as against person and that the situation is really inimical to a stable environment for this child.

\* \* \*

[Mother's] drug use, while not including any drug test failures within a few months, still has by her own testimony been characterized by choosing to use illegal drugs despite knowing what the consequences of those choices would be. This disregard for the Court's orders, for the law and, thereby for her daughter's welfare is another persistence of the circumstances that required the removal. . . . And I do find that that is a persistent condition that doesn't bode well.

\* \* \*

The relapses several times during this custodial episode have been significant and I don't find that her being in relatively stable compliance today is sufficient to overcome a pattern of behavior.

The proof at trial established that, throughout DCS's involvement with the Child, conditions surrounded Mother that led to the Child's removal and prevented her safe return to Mother's custody. By Mother's own testimony, no major aspect of her life ever remained settled for long, whether it be regarding her relationships, work, housing, or drug use. Sadly, losing her children was also a fixture in Mother's life. As late as June 2013, her relationship with J.W. was filled with domestic disputes to the point that custody of another child was lost. In her interview with Dr. Wray, Mother nonetheless described their relationship as "stable."

In May 2014, Mother returned to see Dr. Wray. At that time, Mother reported that she had not been honest during her earlier evaluation in that she was "messed up" then and still using drugs. Mother said she had been working hard to do better since then. Dr. Wray testified, however, that even if a person with a mixed personality disorder maintained a job, a stable relationship, and was drug free for several months, it did not mean they were "cured," or free from future disruptions as disruptions usually followed a period of stability. According to Dr. Wray, as to someone with Mother's type of personality

-9-

disorder, "the best predictor of future behavior is past behavior." Thus, a person with mixed personality disorder "would be more likely to have a continuation of those same problems they have had in the past." Notably, the trial court credited the testimony of both Dr. Wray and Ms. Womack, while finding Mother's testimony to be incredible and concerning. The court observed "that Mother's general demeanor at this hearing tended to be evasive, inconsistent and appeared to be attempting to obfuscate a lot of her answers." Further, the court was "very much concerned" with "[M]other's apparent inability in her testimony to assume responsibility for any of the choices she has made and the actions that she has taken over the period not only of the present custodial situation, but those before it. . . ."

The evidence showed that, throughout the Child's case, Mother refused to acknowledge a serious drug abuse problem. Even after several relapses with methamphetamine, she told Dr. Wray that she had stopped using drugs and had never been an addict. At trial, despite another failed drug screen in November 2013, Mother maintained she was not a "regular user." She conceded she chose to use methamphetamine more than once since the Child's removal even though she was aware she would be randomly tested by DCS. Mother testified that she had changed course, worked on the permanency plan again, and was now drug-free.

On consideration of the evidence in its entirety, we cannot fault the trial court for its unwillingness to credit Mother with a complete turnaround regarding the issues that led to the Child's removal based upon some months of relative stability. At least twice after the Child was removed, Mother's efforts led to real progress and she seemed ready to assume custody of the Child. Then, her situation would quickly erode and any stability she achieved was lost again. Case manager Fowler conceded that while she appeared stable at trial, he was more concerned with where Mother would be, in her life, in the next several months than with her circumstances as of the trial date. As are we. In all, Mother testified to at least five changes in housing, seven different jobs in as many years – with gaps of unemployment in between – and several relationships involving drugs, domestic violence or both since the Child's birth. Mother testified that more changes in her housing and employment were forthcoming.

The evidence does not preponderate against the trial court's findings. In our view, Mother's long history of chronic emotional and behavioral instability, coupled with drug abuse and its related issues, continues to present an obstacle to reunification with the Child. The evidence established that any stability in her life was short-lived, so that there was nothing to show that Mother was capable of providing a safe, stable environment and care for the Child in the foreseeable future.

The evidence does not preponderate against the trial court's judgment that there is

clear and convincing evidence to support the termination of Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

V.

Having found that grounds for termination exist, we next consider the question of the Child's best interest. As we have noted, before terminating a parent's rights, a court must determine that two things have been clearly and convincingly proven — "not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Our review is guided by reference to the non-exclusive list of statutory factors set out at Tenn. Code Ann. § 36-1-113(i).[3] Notably, the issue of what is in the best interest of a

---

[3] The statutory factors include:

    (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

    (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

    (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

    (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

    (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

    (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

    (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

    (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

    (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

-11-

child must be determined from the child's perspective and not the parent's. *Id.* (citing *White v. Moody*, 171 S.W.3d at 194).

In the present case, at the close of the proof, the trial court found that terminating the parent/child relationship was best for the child "because a continuation of that relationship does greatly diminish the child's chances of early integration into a safe, stable and permanent home," an option "very much out there for [the Child]. . . ." In its final order, the court further elaborated its best interest decision as follows:

> As to best interest[,] the Court finds there was clear and convincing proof that [the Child] is in a loving and adoptive foster home, where she has been over 2 years. [Mother] has not made such an adjustment of her circumstances, conduct or condition as to make it safe and in the child's best interest to be in her home. Her relationship with her husband has been, and remains, unstable and whether she will have stable housing in the near future is unproven at this time. Dr. Wray's assessment of the need for long term stability, of which we have no current proof, prevents the parent from effectively providing safe and stable care and supervision of the child; therefore, the Court finds pursuant to T.C.A. § 36-1-113(i), clear and convincing proof that it is in the child's best interest for [Mother's] rights to be terminated and the child freed for adoption.

Before this Court, Mother asserts that the trial court erred in its consideration of the proof in light of the best interest factors. More specifically, Mother asserts that the trial court excluded certain factors that weighed in Mother's favor and improperly considered other factors based on what might happen in the future rather than on Mother's actual situation at the time of trial. We disagree. It is apparent to us that the trial court placed great emphasis on the question of Mother's overall stability in all areas of her life – that is, her ability to "make it safe and in the child's best interest to be in the home," and to provide "safe and stable care and supervision" for the Child. *See* Tenn. Code Ann. § 36-1-113(i)(1),(8). The evidence does not preponderate against the trial court's findings. While certain factors weigh in Mother's favor, including her regular visitation with the Child and payment of child support, others weigh in favor of termination. We are mindful that "the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest." *In re Valentine,* 79 S.W.3d at 546 (citing *State v. T. S. W*., No. M2001-01735-COA-R3-JV, 2002 WL 970434 (Tenn. Ct. App. M.S., filed May 10, 2002)). Generally summarized, evidence exists to support the trial court's finding that, in the two years since the Child's removal, Mother had not

demonstrated a level of stability in her own life, particularly with respect to her personal relationships, housing, or income, to indicate that she was able to provide a safe and stable home and care for the Child on a long-term basis.

In short, there is clear and convincing evidence to show that the Child's interest is best served by permanently severing Mother's parental ties and allowing the Child the opportunity at permanency that her foster family has presented. We therefore uphold the trial court's best interest decision in favor of termination.

## VI.

The judgment of the trial court terminating Mother's parental rights to the Child, M.P.H., is affirmed. Costs on appeal are taxed to the appellant, J.L.W. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE