FILED

09/21/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 9, 2022 Session

## STATE OF TENNESSEE v. JESSICA HARTLE LUMPKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2020-C-1664    Montee Watkins, Judge**

_____

### No. M2021-01144-CCA-R3-CD

_____

The State of Tennessee appeals the trial court's dismissal of two counts of animal cruelty on the basis that an emu met the statutory definition of livestock under Tennessee Code Annotated section 39-14-201, that the animal control officer was not a statutorily qualified livestock examiner and that the animal control officer's consultation with a licensed veterinarian failed to satisfy the requirements of the livestock examination statute. *See* T.C.A. § 39-14-211. We conclude that the emu was not livestock under the plain language of the statute and thus no livestock examination was required to proceed with charges under the animal cruelty statute. *See* T.C.A. § 39-14-202(2). Accordingly, we reverse the trial court's dismissal of counts one and two and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; Elaine Cuthbertson, Assistant District Attorney General, for the appellant, State of Tennessee.

Bernard F. McEvoy, (at trial and on appeal) Nashville, Tennessee, for the appellant, Jessica Hartle Lumpkins.

C.E. Hunter Brush and Y. Larry Cheng, Nashville, Tennessee, and Julie P. Bowling, Columbia, Tennessee for the amicus curiae, Tennessee Farm Bureau Federation and the Farm Animal Care Coalition of Tennessee.

# OPINION

## Facts and Procedural History

At issue in this case is the application of the livestock examination statute in charges of cruelty to animals. On September 16, 2020, the Davidson County Grand Jury indicted Defendant on three counts of animal cruelty in violation of Tennessee Code Annotated section 39-14-202, alleging that Defendant "did fail unreasonably to provide necessary food, water, care or shelter for animals in [her] custody" on three separate dates, March 19, 2019 (count one), November 5, 2019 (count two), and November 13, 2019 (count three). Defendant was a teacher and the director of the agriculture department at McGavock High School[1] in Nashville.

Defendant filed a pretrial motion to exclude testimony from the animal control officer who examined the animals on the three dates alleged in the indictment, arguing that his testimony should be excluded because he was not a qualified livestock examiner under Tennessee Code Annotated section 39-14-211. At the evidentiary hearing, Cory Wells testified that he was the lead field officer for Metro Animal Care and Control ("Animal Control"). Mr. Wells' highest level of education was a high school degree, and he also possessed a certification for animal control officers. After receiving multiple complaints from McGavock High School ("McGavock") students and their families, Officer Wells first went to McGavock on February 23, 2019, to investigate. He met Defendant, and she showed him the area where animals were housed in the agriculture department. He observed a dog, rabbits, guinea pigs, ferrets, cats and gerbils. Officers Wells was concerned about the cleanliness of some of the animal cages and some animals' lack of access to water. Defendant admitted to Officer Wells that multiple animals had died in her care.

Officer Wells conducted a follow-up visit on February 28, 2019, when he also met with Principal Robbin Wall to observe where animals were housed in the McGavock agriculture department. During that visit, Officer Wells observed eleven chickens inside the small animal room without water and noted that the general conditions were the same as they were on his first visit.

Officer Wells returned to the McGavock agriculture department again on March 19, 2019, a few days after receiving a complaint from a school security officer. At that inspection, Officer Wells said he observed both "livestock and companion animals" and noticed that multiple rabbits did not have access to food or water. Before and after that visit, Officer Wells communicated by telephone and email with Dr. Elise Jones-Williams,

---

[1] The agriculture department at McGavock High School is referred to in the record as the agriculture department, the animal science program, and the agriculture tech program. For consistency, we will refer to it as the McGavock agriculture department.

a large-animal veterinarian licensed in Tennessee, with whom Officer Wells often consulted when investigating a case involving livestock. He took twenty to thirty photographs of all of the animals on the property and sent them to Dr. Jones-Williams. He recalled sending Dr. Jones-Williams pictures of an emu named Charley who had been gifted to the school as a pet from a private owner. Dr. Jones-Williams testified that from the photographs received from this visit, she observed Charley to be severely underweight.

Officers Wells visited the McGavock agriculture department again on November 5, 2012. He again observed and took photographs of both "companion animals and livestock animals." During that inspection, he noted that "the rabbits were in cages filled with feces and urine." He also observed a cat on several occasions, but the "cat wasn't an issue through the whole thing." He photographed all of the animals and sent the photographs to Dr. Jones-Williams for examination. Dr. Jones-Williams again testified that Charley the emu, was underweight, and she agreed to visit the emu in person which she did on November 13, 2019.

Following the trial court's question to Officer Wells about the agency protocol, Officer Wells responded as follows:

[Defendant] received multiple notices "starting in February all the way through the last date of inspection on November the 13th. Every time I went out there, there was issues. I would address those issues. I would go over it with her. I would hand-write them out on the notice. I also e-mailed a copy of the concerns from Dr. Jones[-Williams] to Mr. Wall and [Defendant]. There – on many – on every occasion, [Defendant] received guidance on what needed to be corrected.

At the November 13 visit, Dr. Jones-Williams was accompanied by Officer Wells and Lauren Bluestone, the Director of Animal Control. Dr. Jones-Williams performed a "visual cursory exam" of all of the animals which inspection revealed unsanitary conditions in the rabbit and chicken cages. Both Officers Wells and Dr. Jones-Williams noted that the rabbit cages were filthy and overflowing with urine which was flowing into the chicken cages underneath, "the same urine stain that was there on [Officer Wells'] previous visit from November the 5th." Dr. Jones-Williams also noted in her report that the chickens and ducks appeared to be deprived of water, and the goats were malnourished. The hay was not properly stored, and barn stalls were open. The initial subject of the inspection, Charley, was not present on November 13, and Defendant admitted that Charley had died. Officer Wells later learned that "[Defendant] and some students bagged the emu up and tossed it in the dumpster back behind the school," which was "absolutely not" an appropriate method of disposing of the emu's remains. After the November 13 inspection, Dr. Jones-Williams emailed a written report of her findings to Animal Control. Based on that report, the three-count indictment followed.

Following the evidentiary hearing on August 4, 2021, the trial court entered a written order granting Defendant's motion to dismiss counts one and two of the indictment, finding that both counts related to livestock, specifically chickens and an emu; that under the plain language of the livestock examination statute, Officer Wells did not meet the qualifications to examine the livestock; and that there was no exception under the statute to allow for "telehealth" in the examination of livestock. The trial court found that while the emu had formerly been a pet or a companion emu, its status changed to livestock when it was donated to the McGavock agriculture department.

On October 14, 2021, the State filed a notice of appeal from the partial dismissal of the indictment, and this Court waived the requirement for timely filing of the notice.

**Analysis**

When reviewing issues of statutory construction, we conduct a de novo review of the trial court's rulings with no presumption of correctness. *State v. Deberry*, -- S.W.3d --, No. W2019-01666-SC-R11-CD, 2022 WL 3725314, at *2 (Tenn. Aug. 30, 2022); *State v. Welch,* 595 S.W.3d 615, 621 (Tenn. 2020); *State v. Tolle,* 591 S.W.3d 539, 543 (Tenn. 2019). The court's role in interpreting a statute is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Welch*, 595 S.W.3d at 621; *State v. Howard,* 504 S.W.3d 260, 269 (Tenn. 2016). Legislative intent is found in the plain and ordinary meaning of the statute. *Deberry*, -- S.W.3d --, No. W2019-01666-SC-R11-CD, 2022 WL 3725314, at *3 (Tenn. Aug. 30, 2022) ("We give the words of a statute their 'natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose'") (citation omitted); *State v. L.W.*, 350 S.W.3d 911, 916 (Tenn. 2011). Thus, "courts are to give effect to the ordinary meaning of the words used in the statute and presume that each word used was purposely chosen by the legislature to convey a specific meaning." *State v. Marise*, 197 S.W.3d 762, 766 (Tenn. 2006). "When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language[.]" *See Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citation omitted).

There are several well-established principles regarding statutory construction. When interpreting statutes, "the court must (1) give the words of the statute their natural and ordinary meaning, (2) consider the words in the context of the entire statute, and (3) presume that the General Assembly intended for each word to be given its full effect." *State v. Michael Broyles*, No. E2019-01033-CCA-R3-CD, 2021 WL 2156935, at *14 (Tenn. Crim. App. May 27, 2021), *perm. appeal denied* (Tenn. Oct. 13, 2021). Courts must "resolve any possible conflict between statutes to provide for a harmonious operation of the laws." *Frazier v. State,* 558 S.W.3d 145, 153 (Tenn. 2018). "Statutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both." *Nunley v. State*, 552 S.W.3d 800, 825 (Tenn. 2018) (quoting *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). A more specific statutory

4

provision takes precedence over a more general provision. *Frazier,* 558 S.W.3d at 153. And "where the legislature includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that the legislature acted purposefully in the subject included or excluded." *Welch,* 595 S.W.3d at 623 (quoting *State v. Loden,* 920 S.W.2d 261, 265 (Tenn. Crim. App. 1995)). "Where different sections are apparently in conflict we must harmonize them, if practicable, and lean in favor of a construction which will render every word operative." *See Bible & Godwin Const. Co. v. Faener Corp.,* 504 S.W.2d 370, 371 (Tenn. 1974). Furthermore, courts must also presume that the legislature is aware of its prior enactments and decisions of the courts when enacting legislation. *See Carter,* 279 S.W.3d at 564. "We reiterate, moreover, that when the plain meaning of a statute is clear after application of the traditional tools of statutory interpretation, a court should not 'delve into the legislative history of an unambiguous statute.'" *Deberry,* 2022 WL 3725314, at *7 (quoting *Welch,* 595 S.W.3d at 624).

In this case, Defendant was charged with three counts of animal cruelty. Tennessee Code Annotated section 39-14-202 provides, "A person commits an offense who intentionally or knowingly . . . [f]ails unreasonably to provide necessary food, water, care or shelter for an animal in the person's custody[.]" The livestock examination statute provides as follows:

> (a) No entry onto the property of another, arrest, interference with usual and customary agricultural or veterinary practices, confiscation, or any other action authorized by this part or any other law shall be taken in response to an allegation that this part has been violated with regard to livestock unless, prior to or at the time of such action:
> (1) The livestock in question has been examined by:
>    (A) The commissioner of agriculture or the commissioner's duly authorized agent trained to conduct livestock cruelty examinations;
>    (B) A graduate of an accredited college of veterinary medicine specializing in livestock practice; or
>    (C) A graduate of an accredited college of agriculture with a specialty in livestock; and
> (2) Upon examination of the livestock, the commissioner, commissioner's agent, or graduate has probable cause to believe that a violation of this part has occurred with regard to the livestock.
> (b) If a person authorized by this section to make a probable cause examination of livestock does not examine the livestock within twenty-four (24) hours of receiving the allegation, a licensed veterinarian may make the inspection, and the veterinarian's findings shall be afforded the same presumption and effect as an examination conducted by a person authorized pursuant to subsection (a).

T.C.A. § 39-14-211.

The application of the livestock examination statute first requires us to determine if the animal or animals which are the subject of the indicted charges are in fact livestock as defined in the statutory scheme. Tennessee Code Annotated section 39-14-201 provides as follows:

As used in this part, unless the context otherwise requires:
(1)    "Animal" means a domesticated living creature or a wild creature previously captured:
(2)    "Livestock" means all equine as well as animals which are being raised primarily for use as food or fiber for human utilization or consumption including, but not limited to, cattle, sheep, swine, goats, and poultry;
(3)    "Non-livestock animal" means a pet normally maintained in or near the household or households of its owner or owners, other domesticated animal, previously captured wildlife, an exotic animal, or any other pet, including, but not limited to, pet rabbits, a pet chick, duck, or pot bellied pig that is not classified as "livestock" pursuant to this part.

The three-count indictment in this case does not specifically state which animals are the subject of the alleged cruelty in each count. The indictments do, however, specify a particular date for each allegation. Defendant is charged with intentionally or knowingly failing to unreasonably provide necessary food, water, care or shelter for animals in Defendant's custody on March 19, 2019 (count one); on November 5, 2019 (count two), and on November 13, 2019 (count three).

Officer Wells visited Defendant and inspected the McGavock agriculture department a total of five times. No charges were brought from the first two visits. Officer Wells testified that on each visit, he took "well over twenty or thirty " photographs of "[a]ll of the animals on the property, which included rabbits, guinea pigs, gerbils, chickens, a ferret, a cat, goats, emus, a sheep at one point, ducks," and sent them to Dr. Jones-Williams. Officer Wells noticed rabbits, guinea pigs, ferrets, cats and gerbils, which he considered companion animals, without water and in cages "overflowing with feces and urine build-up." On his second visit to the McGavock Animal Science program area on February 28, 2019, Officer Wells said that "[o]verall, it was in the same condition as before."

Specific to March 19, 2019, as referenced in count one of the indictment, Officer Wells testified that he observed what he considered companion animals and livestock. He was concerned specifically about rabbits and Charley, the emu. He sent Dr. Jones-Williams pictures of Charley. Dr. Jones-Williams testified that from the photographs, she observed Charley to be severely underweight.

Count two of the indictment stems from Officers Wells' visit to McGavock on November 5, 2019. Officer Wells testified that he again observed companion animals and livestock animals during that inspection. The rabbits he observed did not have access to

6

food or water and were in cages filled with feces and urine.  There was a cat on the property, but Officer Wells did not have any concerns about the cat.  After Dr. Jones-Williams received photographs from Officer Wells' November 5 visit, specifically one of the photographs of Charley, she was concerned that Charley was underweight, and thus she agreed to visit the emu in person which she did on November 13, 2019.

At the November 13 visit which is the date of the allegations in count three of the indictment, Dr. Jones-Williams was accompanied by Officer Wells and Lauren Bluestone, the Director of Animal Control.  Officer Wells testified that he observed chickens and rabbits in unsanitary conditions.  Both Officer Wells and Dr. Jones-Williams noted that the rabbit cages were filthy and overflowing with urine which was flowing into the chicken cages underneath, "the same urine stain that was there on [Officer Wells'] previous visit from November the 5th."  Dr. Jones-Williams also noted in her report that the chickens and ducks appeared to be deprived of water and the goats were malnourished.  The hay was not properly stored and barn stalls were open.  The initial subject of the inspection, Charley, was not present on November 13, and Defendant admitted that Charley had died.  Officer Wells later learned that "[Defendant] and some students bagged the emu up and tossed it in the dumpster back behind the school," which was "absolutely not" an appropriate method of disposing of the emu's remains.  After the November 13 inspection, Dr. Jones-Williams emailed a written report of her findings to Animal Control.  Based on that report, the three-count indictment followed.

Count three was not the subject of Defendant's motion to dismiss because Defendant concedes that Dr. Jones-Williams was present on November 13 when she examined the animals in question and that Dr. Jones-Williams is a duly qualified livestock examiner under the statute in question.  Defendant further concedes that her motion to dismiss count one and count two applies only to livestock and not to any companion animals that may be the subject of those two counts.

The testimony in the record regarding count one of the indictment charging Defendant with animal cruelty on March 19, 2010, relates to rabbits and Charley the emu.  The testimony in the record regarding count two of the indictment charging Defendant with animal cruelty on November 5, 2019, relates to rabbits, chickens and Charley the emu.  The trial court found that while the emu had formerly been a pet or a companion emu, its status changed to livestock when it was donated to the McGavock agriculture department.  The trial court further found that Officer Wells was not a qualified livestock examiner and dismissed count one and count two for failure to comply with the livestock examination statute.  The trial court did not address count one and count two as related to the rabbits; however, we have included rabbits in our application of the statute to the dismissed indictments.

The statutory definition of livestock includes "all equine."  The definition further includes "animals which are being raised primarily for use as food or fiber for human

7

utilization or consumption including, but not limited to, cattle, sheep, swine, goats, and poultry." We will first address whether Charley the emu meets the statutory definition of "livestock" under the statute. Charley had originally been a family pet who was donated to the McGavock agriculture department. Defendant argues that an emu is poultry which is included in the statutory definition of livestock. The term poultry is not defined in the statutory scheme. However, the statute is clear that "all equine" are livestock, but not all poultry are livestock. The test to determine whether other animals such as poultry are "livestock" as defined in the statute is based on the primary use and purpose of the animal. While there was no specific testimony about the purpose of the McGavock agriculture department, Dr. Jones-Williams' report describes the area she inspected as a lab area and a barn with cages, stalls and a pen. Clearly, as part of a high school education program, the animals were being used for educational purposes. There is no proof in the record that the emu was being raised "primarily for use as food or fiber for human utilization or consumption." The statutory definition of livestock is not ambiguous, and under the plain language of the livestock examination statute, Charley the emu is not livestock.

Even if the definition of "livestock" under the statute were to be considered ambiguous, we can look to the plain language of the definition of "non-livestock animal" for clarity. "Non-livestock animal means a pet normally maintained in or near the household or households of its owner or owners, other domesticated animal, previously captured wildlife, an exotic animal, or any other pet, including, but not limited to, pet rabbits, a pet chick, duck, or pot bellied pig that is not classified as 'livestock' pursuant to this part." T.C.A. § 39-14-201(3). This definition of "non-livestock" clearly supports the determination of whether an animal is livestock based on the primary use and purpose of the animal because "non-livestock" animals can include chicks and pigs, animals that could otherwise be considered livestock, based upon their use and purpose.

Applying the plain language of the definition of livestock in the livestock examination statute, Charley the emu is not livestock. Rabbits are clearly "non-livestock animals" under the statutory definition as there was no proof in the record that they were used for food or fiber under the primary purpose test. Accordingly, the trial court erred in its dismissal of counts one and two based on its determination that the animals observed on March 19, 2019 (count one) and on November 5, 2019 (count two) were livestock and subject to the specific examination requirements set forth in Tennessee Code Annotated section 39-14-201.

Having determined that the animals under Defendant's care and custody as a part of the McGavock agriculture department on November 5, 2019 and on November 13, 2019, do not meet the statutory definition of "livestock" under the livestock examination statute, it is unnecessary for us to further analyze the livestock examination statute with regard to the type of examination required under the statute.

**Conclusion**

For the foregoing reasons, the trial court's dismissal of count one and count two of the indictment was in error and is accordingly reversed. Count one and count two of the indictment are reinstated.

_____
JILL BARTEE AYERS, JUDGE

9