IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2024

## IN RE QUENTIN G.

**Appeal from the Juvenile Court for Cumberland County**
**No. 2023-JV-9860   Amanda Magan Worley, Judge**

_____

### No. E2023-01632-COA-R3-PT

_____

This appeal arises from a petition to terminate parental rights. The trial court found by clear and convincing evidence that one ground for termination existed as to the father based on a prior adjudication of severe child abuse and that termination was in the best interest of the child. The father appeals. We affirm the trial court's decision and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Patricia A. Hubbard, Crossville, Tennessee, for the appellant, Justin G.

Jonathan Skrmetti, Attorney General and Reporter, and Carrie A. Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Sherrill Rhea, Crossville, Tennessee, guardian ad litem.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

This appeal arises from the termination of the parental rights of Justin G. ("Father") to his son, Quentin G. Many of the facts and procedural history in this matter involve Quentin's mother, Magdalena N. ("Mother"), and the termination petition concerned her parental rights. Prior to the trial, however, Mother passed away. Therefore, this appeal only concerns the termination of Father's parental rights.

In March 2022, the Department of Children's Services ("DCS") received a referral stating that Mother tested positive prenatally for benzodiazepine, opiates, THC, and buprenorphine. After Quentin was born, he tested negative on a urine drug screen, but his umbilical cord blood was positive for THC and buprenorphine. Father also lived in the home with Quentin and Mother, and he admitted to using THC and had a prescription for buprenorphine. Mother and Father agreed to participate in non-custodial services with DCS.

In May 2022, Father and Mother got into an argument, and Mother left the home with Quentin while Father was sleeping. A case manager from DCS attempted to contact Mother several times. After experiencing some difficulty locating Mother and Quentin, the case manager sent a text message to Mother advising her that DCS had set up an emergency team meeting and that Mother needed to bring Quentin to the meeting. The case manager did not receive a response from Mother, and Mother and Quentin were not present for the family team meeting. DCS subsequently filed a petition in the juvenile court alleging that Quentin was dependent and neglected and requesting that temporary custody of Quentin be awarded to Father. On the same day the petition was filed, the juvenile court entered a protective custody order placing temporary care and custody of Quentin with Father. The court also ordered that Mother be restrained from having contact with Quentin except for supervised visitation.

A few days later, a hair follicle test was performed on Quentin, and he tested positive for amphetamine, methamphetamine, buprenorphine, norbuprenorphine, and THC. Thereafter, in June 2022, a case manager from DCS was called to Father's home. Father was taken into police custody due to an alleged domestic assault between Father and the mother of his thirteen-year-old daughter. According to law enforcement, when they arrived at the home, Father appeared to be under the influence of drugs and alcohol. Father's thirteen-year old daughter reported to the case manager that Father had been using heroin and drinking alcohol. She also stated that when she tried to call 911, Father grabbed her arm to get the phone away and left a mark from his thumb on her wrist. The case manager also spoke with Father's neighbor, who stated that she heard the altercation and took Quentin away from the home. The neighbor also told the case manager that Mother was staying in the home overnight.

DCS filed an amended petition requesting that temporary legal custody of Quentin be awarded to DCS and that the court determine whether the parents committed severe child abuse. The juvenile court entered a protective custody order removing Quentin, then three months old, from Father's custody and placing custody of the child with DCS. Father waived the preliminary hearing. In October 2022, the juvenile court entered an adjudicatory and dispositional hearing order, finding that Quentin was dependent and neglected and a victim of severe child abuse, as defined by Tennessee Code Annotated section 37-1-102(b)(27), perpetrated by Mother and Father and ordering that custody of

Quentin remain with DCS.[1]

In June 2023, DCS filed a petition in the juvenile court to terminate Father's parental rights to the one-year-old child, alleging the ground of severe child abuse. DCS further alleged that it was in the best interest of the child for Father's parental rights to be terminated. In October 2023, the juvenile court held a trial on the petition. Father was not present for the trial. The court first heard testimony from Sara Tungate-Dorris, a team leader at DCS. Ms. Tungate-Dorris testified that Quentin had been in the same foster home since he entered DCS custody in June 2022. In his pre-adoptive foster home, he developed a strong bond with the foster parents, and the foster parents were the only people he had known as mother and father. She explained that whenever she went to the foster home, she observed Quentin going to the foster parents "both for comfort and for joy." Quentin also developed a bond with the foster parents' other children, their grandchild, and Quentin's sister who also lives in the home. She testified that the foster parents meet Quentin's regular needs. She further stated that she would have concerns if Quentin were removed from the foster parents' home because he was incredibly bonded to them.

Concerning Father's visitation, Ms. Tungate-Dorris testified that whenever she took over the case in August 2022, he was visiting consistently. The visits went well in the beginning, but as Quentin got older, the visits did not go well because they all occurred at a Mexican restaurant where Father had to "wrangle" Quentin to keep him seated in a booth for two hours. She explained that Father chose the Mexican restaurant, which was close to where he lived, as the location for the visits. Even after DCS offered transportation for visits at other places, Father did not agree to a change of location. Around February 2023, the visits started dwindling, and Father did not provide any reason for why he was visiting less. She explained that visitation stopped in June 2023 after DCS requested that visitation be suspended because Father was noncompliant with the responsibilities on the permanency plan. However, Father never petitioned the court for a reinstatement of visitation, and he never talked to her about how he could reinstate visitation.

Ms. Tungate-Dorris also discussed Father's progress on the permanency plans. She testified that Father did not submit to any drug screens that she attempted to perform. She stated that Father had reported that he did complete an A&D assessment, and she believed that he completed an assessment when there was a Family Support Services case. However, Ms. Tungate-Dorris stated that he did not complete any of the recommendations

---

[1] Three permanency plans were developed for Father. The plans contained a number of responsibilities for Father, including, among others, the following: (1) complete an alcohol and drug ("A&D") assessment and follow its recommendations; (2) submit to random drug screens; (3) complete parenting classes; (4) complete domestic violence classes; (5) complete a psychological evaluation and follow its recommendations; (6) establish and maintain safe housing; (7) attend all visitations as scheduled; (8) pay child support; (9) apply for health insurance; and (10) sign a release of information to allow DCS to communicate with Father's probation officer. Each plan was ratified by the juvenile court.

from the A&D assessment. She provided contact information for several providers and offered transportation so that Father could complete another A&D assessment, but Father did not complete another assessment. Ms. Tungate-Dorris also testified that she submitted three purchase requests for DCS to pay for a psychological evaluation for Father and provided him with the provider's contact information, but he did not complete a psychological evaluation or attend mental health appointments. Although she provided contact information and submitted purchase requests for domestic violence classes, Father did not complete those either. She stated that Father had stable housing throughout the case, but the home was never safe for the child. There were exposed wires, clutter, cigarette smoke, and boxes piled ceiling high in the home. She visited the home several times, and by her last visit in June 2023, these issues were not rectified. Ms. Tungate-Dorris also stated that Father never signed a release of information for his probation officer as required by the permanency plan. Concerning support, Ms. Tungate-Dorris stated that Father never provided anything for Quentin outside of visits. At visitation, however, he allowed Quentin to eat some of the food off of his plate, and he gave a gift to Quentin for his birthday.

Ms. Tungate-Dorris further testified that she last had contact with Father in August 2023. She recalled that Father stated that he was going to a substance abuse treatment program. However, Ms. Tungate-Dorris testified that she requested records from the substance abuse treatment program, but she did not receive anything. Ms. Tungate-Dorris explained that she knew that Father had a criminal history and had seen him paying court fines. However, she was not sure of the extent of Father's criminal history. When questioned about why DCS required Father to complete domestic violence classes, Ms. Tungate-Dorris stated that there was domestic abuse between him and Mother and between him and the mother of his older child.

The court next heard testimony from the foster father. He testified that Quentin had been in his home since he entered DCS custody at three months old, and he had remained in the home for approximately sixteen months. He stated that in his home, Quentin had begun to talk and to use words like "mama" and "dada" to refer to him and his wife. He explained that Quentin suffered from severe allergies, and the foster parents took him to the doctor several times to address it. The foster father also stated that his two eight-year-old sons and Quentin's little sister also live in his home. When questioned about whether Quentin gets along with the two boys in the home, the foster father answered that they "do well together." He also stated that Quentin "likes to be close" to his little sister. The foster father further testified that Quentin is well-bonded to him and his wife. He stated that he would adopt Quentin if he were available for adoption.

The foster father also testified that he never received any support from Father for the child. However, he recalled that Father gave Quentin toys for Christmas and his birthday. He also testified that Quentin did not seem happy to go to visits with Father, and he would often cry when the foster father dropped him off at visitation.

- 4 -

At the conclusion of trial, the trial court rendered an oral ruling. In November 2023, the trial court entered a final written order terminating Father's parental rights. Based on the juvenile court's order that found that Quentin was a victim of severe child abuse perpetrated by Father, the trial court found that the ground of severe child abuse was proven by clear and convincing evidence. The court also found that it was in the best interest of the child to terminate Father's parental rights. Father filed a timely notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues for review on appeal, which we have slightly restated:

1. Whether the trial court erred in finding that DCS proved by clear and convincing evidence that the ground of severe child abuse existed to terminate Father's parental rights;
2. Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the child's best interest.

For the following reasons, we affirm the decision of the trial court and remand for further proceedings consistent with this opinion.

## III. STANDARDS APPLICABLE TO TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the child under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction

regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

We review the juvenile court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). In regard to conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Severe Child Abuse

Tennessee Code Annotated section 36-1-113(g)(4) provides that one ground for termination of parental rights exists if:

> The parent . . . has been found to have committed severe child abuse, as defined in [section] 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

The plain language of section 36-1-113(g)(4) makes clear that "the finding of severe abuse can be based on a prior court order or on evidence of 'severe child abuse' submitted to the court hearing the termination case." *In re Brianna T.*, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at *4 (Tenn. Ct. App. Dec. 22, 2017). "It is well settled that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and is not required to re-litigate the issue of severe abuse during the termination trial, so long as the prior order is final." *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *6 (Tenn. Ct. App. May 23, 2018). This Court has consistently applied the doctrine of res judicata to prevent a parent from re-litigating the issue of severe child abuse in a parental termination proceeding when the finding of severe child abuse has become final. *See In re Karisah N.*, No. M2018-00555-COA-R3-PT, 2018 WL 6179470, at *10 (Tenn. Ct. App. Nov. 27, 2018); *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016). "[A] severe abuse finding in a dependency and neglect action becomes final when it was not timely appealed following the dependency and neglect hearing." *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7,

2020) (citing *In re Karisah N.*, 2018 WL 6179470, at \*10; *In re Dakota C.R.*, 404 S.W.3d 484, 497-98 (Tenn. Ct. App. 2012)).

Here, the juvenile court found, in the dependency and neglect case, by clear and convincing evidence that Quentin was a victim of severe child abuse, as defined in Tennessee Code Annotated section 37-1-102(b)(27), perpetrated by Father. Father did not appeal this order. Therefore, the juvenile court's adjudicatory order has become final, and any challenge to the findings therein is barred in this case by res judicata. *See In re F.S.*, No. E2020-00906-COA-R3-PT, 2021 WL 354231, at \*7 (Tenn. Ct. App. Feb. 2, 2021). Because the final order of the juvenile court found that Father committed severe child abuse, this ground for termination of Father's parental rights "is effectively established." *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011). Therefore, we conclude that the trial court did not err in finding that this ground for termination existed as to Father.

## B. *Best Interest of the Child*

We now turn to address whether the trial court erred in finding that it was in the best interest of the child to terminate Father's parental rights. Our supreme court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually

intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017). The twenty statutory best-interests factors are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of

circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). Because evaluation of these factors often involves discussion of similar issues, we combine our discussion of them "based on the overarching themes within the list of twenty factors." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We begin by addressing the child's needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning a child's need for stability), (B) (concerning how a change in caretaker would affect a child's well-being), (D) (concerning the attachment between the parent and child), (E) (concerning visitation between parent and child), (H) (concerning the child's parental attachment with individuals other than the parent), (I) (concerning the child's relationship with others), and (T) (concerning the effect of the parent's fitness on the child). Quentin, at his young age, deserves to grow up in a stable home. His foster parents have continuously provided a stable home for him since he entered their home in June 2022. At their home, he has developed a strong bond with his foster parents and the children in the home, and his foster parents meet his needs. Quentin's relationship with his foster family stands in contrast to his relationship with Father. Due to infrequent visitation and a location for visits that was not conducive to developing a meaningful relationship, Father has not used visitation to cultivate a positive relationship with Quentin. Likewise, due to Father's recent history of drug use and failure to complete a psychological assessment or receive any mental health treatment, it is likely that Father's emotional fitness would prevent him from consistently and effectively providing safe and stable care and supervision to Quentin. Therefore, we find that these factors weigh in favor of termination.

Next, we address the factors pertaining to Father's home. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N) (concerning abuse or neglect in the parent's home), (O) (concerning whether the parent has provided safe and stable care to any child in the past), (Q) (concerning the parent's commitment to maintaining a home that meets the child's needs), and (R) (concerning the health and safety of the parent's home). Father has a history of abuse and neglect in his home, and he has never provided safe and stable care for Quentin or any other child. Furthermore, as previously discussed, Ms. Tungate-Dorris testified that Father's home was not safe or suitable for the child due to the clutter, exposed wires, cigarette smoke, and boxes piled ceiling high. Therefore, we find that these factors weigh in favor of termination.

We now consider Father's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (concerning the parent's demonstration of continuity and stability in meeting the child's needs), (J) (concerning the parent's lasting adjustment of circumstances), (K) (concerning the parent's use of available programs, services, or community resources), (L) (concerning DCS's efforts), (M) (concerning parent's sense of urgency), and (P) (concerning the

parent's understanding of the child's needs). Although DCS made reasonable efforts to assist Father by developing permanency plans, attempting to conduct drug screens for Father, and providing contact information for providers to complete assessments, Father did not complete many of the responsibilities on his permanency plan or attempt to complete many of the services he needed to effect lasting change that would ensure that it was safe to return the child to his care. Father's failure to take advantage of resources evinces a lack of urgency in seeking custody of the child and a lack of understanding of the child's needs. We therefore find that these factors weigh in favor of termination.

Considering factor (S), Father has only provided Quentin with Christmas and birthday gifts and food from his plate during visitation. We find this support to be token at best. Therefore, we find that this factor weighs in favor of termination.

Finally, we address factors (F) and (G). The court heard no testimony regarding whether the child would be fearful of living in Father's home or whether Father's home would trigger the child's trauma or post-traumatic symptoms. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F), (G). Therefore, we find these factors inapplicable in the present case.

After reviewing the statutory factors found in Tennessee Code Annotated section 36-1-113(i)(1), we conclude that the juvenile court properly determined that termination of Father's parental rights was in the best interests of Quentin.

## V.   CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court. The case is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellant, Justin G., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE